UNITED STATES of America,
Plaintiff-Appellee,

v.

Ramon Rolando SARDUY,
Defendant-Appellant.

No. 78–5297.

United States Court of Appeals,
Fifth Circuit.

March 8, 1979.

Ramon Ramos, Jr., Charles L. Roberts, El Paso, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., El Paso, Tex., LeRoy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, COLEMAN and RO-NEY, Circuit Judges.

COLEMAN, Circuit Judge.

This is a stop and search of a motor vehicle by Border Patrol agents. The convicted defendant says on appeal that his Fourth Amendment rights were infringed. We think not, and affirm.

Ramon Rolando Sarduy was tried to the court and convicted of knowingly transporting illegal aliens in violation of § 274 of the Immigration and Nationality Act, 8 U.S.C. § 1324(a)(2). Sarduy now urges that the District Court erred when it did not suppress the evidence uncovered as a result of the stop, including Sarduy's subsequent confession and the testimony of three aliens caught in the search.

## I. *The Location*

The United States Border Patrol maintains a permanent immigration checkpoint about three miles north of Truth or Consequences, New Mexico, *United States v. Morrison*, 429 U.S. 1, 97 S.Ct. 24, 50 L.Ed.2d 1 (1976). The checkpoint is 98 miles north of the international boundary with Mexico and the government concedes that it is not a functional equivalent of the border. It is situated immediately on Interstate Highway 25 (I–25), a paved four-lane highway running directly to El Paso, on the Mexican border.

An older highway, U. S. Highway 85, two lanes wide and paved, runs along parallel with I–25. Highway I–25 crosses U. S. 85 at various points between El Paso and the checkpoint. According to the testimony, Highway 85 has "places where you can't drive it all the way; it dead ends and you have to get back on the Freeway [I–25]." Approaching from the south, Highway 85 runs into, and joins up with, I–25 at a point a mile and a half north of the checkpoint.

The I–25 checkpoint is connected directly with a sensor device on Highway 85, which passes only 400 yards away and in sight of the checkpoint.

## II. *The Stop*

Border Patrol agents Murray and Ford were on duty at the checkpoint on the night of January 18, 1978. Both agents had considerable experience in that area. They have worked at the checkpoint since it began operations in November, 1971. Both men were able to recognize "locals" because they knew "just about everybody that lives out on the ranches". Traffic was light. Between ten and fifteen cars were seen traveling on U. S. 85 and "most of those were all locals".

At about 8:30 o'clock the U. S. 85 sensor device was tripped. Although it was after dark, Agent Murray noticed what "looked like a vehicle pulling something", traveling north.

Murray and Ford drove the mile and a half north to the point where the highways

converged (Exit 83). When they got there they saw that "it was a pickup pulling a U-haul trailer" and, further, that the driver did not appear to be a local resident.

The Ford pickup drove by the agents and onto I–25. The agents followed. They observed that the pickup carried Colorado license plates and that the trailer displayed Texas license plates. The trailer was "whipping bad from side to side . . . weaving pretty bad down the road even on flat ground" as though heavily loaded, but the bed of the pickup was empty.

After eight and a half miles on I–25 the agents stopped the pickup. Sarduy was its only occupant. In response to Agent Murray's questions concerning his citizenship, Sarduy said that he was Cuban but that he had left his papers "in my home in Oregon". Agent Murray then asked what was in the U-haul trailer. Sarduy replied that the trailer contained "just some stuff" and asked Agent Murray whether he would "like to look?" Agent Murray opened the trailer doors and discovered "several people in there". In fact, the trailer carried six aliens being smuggled into the United States.

### III. *The Confession*

Upon finding the aliens in the trailer the agents arrested Sarduy and read him his rights in both English and in Spanish. Although Sarduy declined to sign a waiver form he "stated that he understood what his rights were". Subsequently, Sarduy informed Agent Ford that "a friend of his in Denver" owned the pickup and that he had rented the trailer in El Paso, Texas, "[B]ecause they told me to."

Following Sarduy's arrest he was taken to El Paso. There, the next morning, after again being advised of his rights, Sarduy gave a detailed confession of his participa-

tion in the alien smuggling operation. Sarduy had recently been recruited to assist in it. At first, he made "numerous trips into El Paso on so-called training missions". He was instructed to rent a room and then await notification that aliens were ready to be transported. He would then rent a U-haul trailer and the trailer would be left at a certain corner for two hours, where it would be loaded with aliens. Sarduy then was to drive this trailer to Albuquerque, New Mexico, "circumventing the checkpoint at Truth or Consequences". He was to receive $1,000 and expenses for each trip.

Sarduy successfully followed this procedure on January 3 or 4, 1978. He was in the process of following it again on January 18, 1978, when he was apprehended as above recited.

### IV. *The Motion to Suppress*

On March 20, 1978, Sarduy filed a motion to suppress. This motion was carried along with the trial, which began on April 5, and was denied. Sarduy was found guilty of three counts of violating the Act and sentenced to three years confinement on each count, to be served concurrently. Thus we have this appeal.

### V. *Considerations Surrounding the Stop*

It would appear that the officers did not act precipitately, or arbitrarily, or with an intent to harass. They did not stop the vehicle as it entered I–25. They followed it in an effort to get the full picture before stopping it.

■ Agents Murray and Ford were experienced Border Patrol officers.[1] Murray lived in the area and knew most of the local people on sight. It was known that U. S. 85 is used by "lots of aliens . . . to by-pass—circumvent the checkpoint", and the

---

1. That a Border Patrol agent is experienced does not create an "irrebuttable presumption" that his determination to stop a vehicle is correct, but it is a factor to be considered in determining whether the agent's suspicion was a reasonable one. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Villarreal*,

5 Cir. 1978, 565 F.2d 932, 936 n. 4; *United States v. Escamilla*, 5 Cir. 1977, 560 F.2d 1229, 1233. *Compare United States v. Saenz*, 5 Cir. 1978, 578 F.2d 643, 646, *and United States v. Payne*, 5 Cir. 1977, 555 F.2d 475, 477–78 *and United States v. Barnard*, 5 Cir. 1977, 553 F.2d 389, 391–92.

Border Patrol had caught aliens "all the time off of (sic) this road here".[2]

In the six years Murray had been working at the checkpoint he had not seen "twenty trailers—U-haul trailers of any kind that you rent, driving up U.S. 85".[3]

The pickup truck was carrying Colorado license plates, pulling a trailer with Texas license plates. It could be expected in the absence of some extraordinary reason that one traveling from Texas to Colorado, towing a trailer, would use the faster four lane interstate highway rather than the winding, segmented, two lane U. S. 85.

■ The agents knew from experience that Colorado was frequently the destination of those smuggling aliens into the United States.

The badly weaving trailer was indicative of a heavy load.[4] The pickup bed was empty. Most persons would probably reduce the risk of an accident by removing some cargo from the trailer and loading it into the pickup bed. A failure to do this could suggest a cargo not meant for the public eye.

We think this conviction is due to be affirmed under the factual standards prescribed for *roving patrols* when making stops on the open road, *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

*Brignoni-Ponce, supra,* held that except at the border and its functional equivalents roving border patrol officers may stop vehicles only if they are aware of specific articulable facts, together with rational inferences therefrom, which would reasonably warrant suspicion that the vehicles are occupied by aliens who may be illegally in the United States. If the observations of the officer leads him reasonably to suspect that a particular vehicle *might* contain illegal aliens he may question the occupants about their citizenship and immigration status and ask them to explain suspicious circumstances. After that, further detention or search must, of course, be based on consent or probable cause.

At note 10 in *Brignoni-Ponce* we find that the existence or non-existence of reasonable suspicion for a stop must be determined from the "totality of the particular circumstances", 422 U.S. at 885, 95 S.Ct. 2574.

*Brignoni-Ponce* recognized, among others, the following factors which may be taken into account in deciding whether there is a reasonably articulable suspicion to stop a vehicle:

(1) Officers may consider the characteristics of the area in which a vehicle is encountered;

(2) The usual patterns of traffic on the particular road;

(3) Previous experience with alien traffic;

(4) The vehicle may appear to be heavily loaded;

(5) The officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling.

---

2. *See United States v. Lujan-Miranda*, 5 Cir. 1976, 535 F.2d 327, 328; *United States v. Estrada*, 5 Cir. 1976, 526 F.2d 357, 358. *See also United States v. De Witt*, 5 Cir. 1978, 569 F.2d 1338, 1339 (roadside park).

3. *United States v. Barnard*, 5 Cir. 1977, 553 F.2d 389, 391–92 (unusual to see vehicle); *United States v. Lopez*, 5 Cir. 1977, 564 F.2d 710, 713; *United States v. Gandara-Nunez*, 5 Cir. 1977, 564 F.2d 693, 694 (large trunk); *United States v. Daly*, 5 Cir. 1974, 493 F.2d 395, 396 (toolbox large enough to contain person).

4. We have consistently regarded the fact that a vehicle is heavily loaded as a factor justifying a stop. *See e. g., United States v. Hosch*, 5 Cir. 1978, 577 F.2d 963, 966 (rear end "riding very low"); *United States v. Lopez*, 5 Cir. 1977, 564 F.2d 710, 712–13 ("Persons hiding . . . tend to make a trunk ride low") (dictum); *United States v. Gandara-Nunez*, 5 Cir. 1977, 564 F.2d 693, 694 (car riding low); *United States v. Payne*, 5 Cir. 1977, 555 F.2d 475, 477–78 (El Camino camper looked and handled as if heavily loaded); *United States v. Barnard*, 5 Cir. 1977, 553 F.2d 389 (heavily loaded); *United States v. Garza*, 5 Cir. 1976, 544 F.2d 222, 224–25; *United States v. Walker*, 5 Cir. 1975, 522 F.2d 194.

As discussed, *ante*, all of these factors were present in this case. Upon consideration of the totality of the circumstances, we must hold that the stop here in issue did not infringe Sarduy's Fourth Amendment rights.

Probable cause for a search was quickly established after the stop and, moreover, the record shows that Sarduy invited the officers to search.

The judgment of conviction is

AFFIRMED.