UNITED STATES of America,
Plaintiff-Appellant,

v.

Ismael SALAZAR–MARTINEZ,
Defendant-Appellee.

No. 83–1026
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Aug. 1, 1983.

Rehearing and Rehearing En Banc
Denied Sept. 19, 1983.

Sidney Powell, Joseph Casseb, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellant.

Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., for defendant-appellee.

Before CLARK, Chief Judge, POLITZ and HIGGINBOTHAM, Circuit Judges.

CLARK, Chief Judge:

The government appeals from the suppression of evidence acquired in a warrantless arrest of Ismael Salazar-Martinez. The district court held that the Immigration and Naturalization Service (INS) agent who arrested Salazar did not have the reasonable suspicion required to justify the stop of his vehicle. Finding the ruling to be erroneous, we reverse.

On October 5, 1982, Salvador Molina, an agent assigned to the INS anti-smuggling unit, received a tip from a confidential informant that two vehicles would be transporting undocumented aliens to Houston via Interstate Highway 10 sometime that morning. Molina stationed his unmarked car on an embankment overlooking I–10, at a point 15 miles east of San Antonio, Texas, and approximately 165 miles from the United States-Mexico border.

I–10 is a major interstate highway, traversing the southern United States from Florida to California. The interconnection of I–10 and I–35 at San Antonio makes this the direct interstate freeway from Nuevo Laredo, Mexico to Houston. Molina was aware that I–10 is a frequently used route for the smuggling of people and contraband from Mexico to Houston and points beyond.

After maintaining surveillance for a brief period, Molina decided that he had missed the two vehicles. As he started to drive down the embankment, he noticed a 1973 Lincoln Continental, one of the largest stock passenger vehicles manufactured, with Texas license plates, heading east at a rate in excess of the speed limit. When the driver saw Molina's vehicle on the embank-

ment, he decelerated. As he passed Molina's auto, he glanced over quickly and then looked forward. The passenger in the front seat who was seated near the passenger-side door and the two in the back seat who were seated in the extreme corners of that seat looked straight ahead.

Molina testified that because of the reactions and unusual locations of the persons visible in the large vehicle he became suspicious, drove onto the highway and, during a several minute period, positioned his car immediately behind, ahead, and then alongside the Continental. The driver of the Lincoln looked over at Molina "nervously," but the three passengers continued to look ahead. Molina observed that the passengers appeared "unkempt," "unwashed," "uncombed," and "shabbily dressed." More significantly, Molina saw two additional passengers in the rear and one additional passenger in the front who were kneeling on the floorboard with their upper torsos and heads down on the seats. Molina stopped the Continental. Upon questioning the occupants, Molina learned that Salazar and the six passengers were undocumented, that Salazar had smuggled them into the country and was transporting them to Houston for a fee.

Molina further testified that his tip did not involve a Continental, that such luxury autos were not typically used to smuggle aliens, that he had never seen an alien smuggled by kneeling on the floorboard of a vehicle with his head on the seat, and that it was an entirely normal reaction for anyone speeding to slow down and glance nervously at a vehicle which was thought to contain a law enforcement officer.

The standard by which the district court and this court are bound to gauge the lawfulness of the actions of Agent Molina is whether he was aware of specific articulable facts, together with rational inferences from those facts that reasonably warranted suspicion that the vehicle contained aliens who may be illegally in the country. *United ed States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). We are bound to look at the totality of the circumstances, considering Molina's 13 years of experience, his participation in the arrest of more than 200 transporters of aliens during his career, the time of the stop, the characteristics of the area, its proximity to the border, previous experience with alien traffic along that route, the characteristics of the vehicle, and the number and behavior of its occupants. *United States v. Ballard,* 600 F.2d 1115, 1119 (5th Cir.1979).

We know that Agent Molina had been alerted by an anonymous telephone call to expect the transportation of illegal aliens along Interstate 10 on this particular day. Agent Molina knew that the portion of Interstate 10 where the stop occurred connects with Interstate 35 to form a nonstop route from Mexico, to Houston, Texas. Agent Molina knew that San Antonio, just to the east of the stop point, was a hub of smuggling activity. But we also know that the stop occurred 165 miles from the Texas-Mexico border. Proximity to the border is a factor in the *Brignoni-Ponce* calculus, but it is not controlling if other articulable facts give rise to the requisite reasonable suspicion. *United States v. Lamas,* 608 F.2d 547, 549 (5th Cir.1979). If there is no proof that the agent reasonably believed that the vehicle has crossed the border in a case which occurs some distance from that line of demarcation, then we are instructed to "examine charily the remaining facts marshalled by the government to support the agent['s] suspicions." *United States v. Pena-Cantu,* 639 F.2d 1228, 1229 (5th Cir. 1981). Even examining these facts charily nonetheless produces a firm belief that they are sufficient to create in Agent Molina a reasonable suspicion of illegal activity.

We know that Agent Molina knew that the Lincoln automobile he observed was a luxury type car, large enough to ride six or seven passengers comfortably in normal seated positions. We know that he observed that all of this car's occupants were of Mexican descent and looked extremely unkempt.[1] Agent Molina had

---

1. When asked if the passengers looked as though their hair was windblown from having

ridden in a car with the windows down, Molina

found that most of the thousands of aliens he had detected when traveling do not comb their hair. They appear unwashed and unkempt. Molina knew that the passengers in this vehicle possessed all of these characteristics. Their shabby dress was also consistent with the typical appearance of illegal aliens.

In the three to four minutes that Agent Molina had the Lincoln under observation before he stopped it, he noted that the occupants of the back seat were seated in the extreme corners of the seat. Prior to the time he stopped the vehicle he was able to observe that the car was occupied not only by the four passengers who intended to be seen by persons outside the car, but also by three more people who were uniquely positioned with their knees on the floorboard of the vehicle, their heads down and upper torsos laid on the seats. From the fact that these concealed passengers were moving their heads from time to time he could tell that they were obviously awake. Yet they continued to ride in that semi-concealed position during the entire time they were under observation.

From all of these pre-stop observations, Officer Molina reasonably deduced that the car contained aliens seeking to avoid suspicion and detection, and that their behavior was typical of illegal aliens who were being transported. The trial judge made the following unchallenged findings:

> As he was following the Continental, Molina observed something unusual. There appeared to be additional persons in the vehicle, with their hands and knees on the floorboards and with their heads face down on the seat. There appeared to be one additional person in the front and two additional persons in the back who were situated in this manner. Molina could observe them when they moved around and their heads occasionally bobbed up. This behavior seemed quite unusual in a luxury car that could comfortably seat six or seven people. In addition, from his experience, Molina knew that it was characteristic of illegal

aliens to attempt to conceal themselves from view.

> Molina believed that the vehicle contained illegal aliens based on his experience, the shabby dress and unkempt appearance of the visible passengers, and the fact that three of the passengers were evidently concealing themselves, with their hands and knees on the floorboards. Accordingly, Molina determined to stop the vehicle to determine the status of its occupants.

These findings clearly support the conclusion that Agent Molina possessed specific articulable facts which generated rational inferences and the requisite reasonable suspicion that the Lincoln contained illegal aliens.

Salazar relies in particular upon *United States v. Orona-Sanchez,* 648 F.2d 1039 (5th Cir.1981), and *United States v. Pacheco,* 617 F.2d 84 (5th Cir.1980). In these cases, the fact that the passengers were "hunkered down" was considered relevant but insufficient. Both cases are distinguishable because of the unique and concealing nature of the posture of both the visible and unvisible passengers in this case. Taken with the other factors present in this stop—the large, luxury automobile and its incongruous, unkempt occupants—makes this case different from *Orona-Sanchez* and *Pacheco.*

In the course of colloquy with counsel at the end of the proof, the district judge stated,

> I congratulate Mr. Molina on being a good border patrolman....

> ....

> [D]own here on this level, I am just a sergeant and I do what the captain tells me to do; and they have told me plain that this case won't stand up; and so ... If the Government wants to take it up, I will be delighted if they reverse it.

> And Mr. Casseb [Asst. U.S. Attorney], I encourage you, if you have any hopes I am wrong, take it up and let them write some good law for Mr. Molina.

testified, "The only people I have ever encountered that looked like that were people that hadn't combed their hair in 3 or 4 days. I think windblown is one thing, and waking up without combing your hair looks different."

He further stated that the reason he concluded the case to be too thin to pass muster was because he could hear this court saying that it was just as consistent for those men to be saying their prayers as to be illegal aliens concealing their presence.

The district judge's true instincts were the correct ones. Agent Molina reasonably, properly concluded that the passengers were illegal aliens who had assumed their unusual and concealed positions that were bearable and swapable with those seated erectly for a lengthy period of time while they were unlawfully driven over interstate highways from Mexico to Houston, Texas. Nothing in our prior case law indicates that Agent Molina's conduct was other than in the highest tradition of proper law enforcement. We accordingly grant the trial judge's wish and reverse his decision.

REVERSED.

POLITZ, Circuit Judge, dissenting:

As the district court so aptly observed at the close of the suppression hearing, "... what this case boils down to in the end is that [Agent Molina] ... doesn't have anything really exceptional to go on except the posture of those four people that were bent over in the car." Because Fifth Circuit jurisprudence militates against a conclusion that this factor gives rise to a reasonable suspicion of criminal activity, whether considered alone or in conjunction with the passengers' unkempt hair, shabby clothing, and avoidance of eye contact, I most respectfully dissent.

We have repeatedly held that a vital element of the *Brignoni-Ponce* test is whether the detaining officers had reason to believe that the suspect vehicle's journey had originated at the border. *See United States v. Orona-Sanchez,* 648 F.2d 1039 (5th Cir. 1981), and cases cited therein. Where the stop occurs a substantial distance from the border, this element has been found lacking. *See, e.g., Orona-Sanchez* (100 miles); *United States v. Lamas,* 608 F.2d 547 (5th Cir. 1979) (190 miles); *United States v. Lopez,* 564 F.2d 710 (5th Cir.1977) (55 miles); *United States v. Escamilla,* 560 F.2d 1229 (5th Cir.1977) (70 miles). Here, Agent Molina

testified that he had no grounds for believing that defendant's vehicle had recently crossed the border. Nor can such a belief be presumed, defendant having been interdicted on a heavily-traveled interstate highway, at a distance of 165 miles from the border and a mere 15 miles from one of the largest metropolitan areas in Texas.

Despite its central role in the *Brignoni-Ponce* calculus, the element of proximity to the border is not essential if other articulable facts give rise to the requisite reasonable suspicion. *United States v. Lamas; United States v. Escamilla.* Absent proof of the agent's reasonable belief that the vehicle had entered this country from Mexico, however, we are compelled "to examine charily the remaining facts marshalled by the government to support the agent['s] suspicions." *United States v. Pena-Cantu,* 639 F.2d 1228, 1229 (5th Cir.1981). When subjected to this exacting scrutiny, the remaining circumstances motivating Agent Molina to intercept defendant's automobile did not reasonably warrant his suspicion that criminal activity was in progress.

As the district court pointed out, and Molina testified, there was no connection between the anonymous tip and the fortuitous arrival of defendant's Lincoln on the scene. Since it was not the type of vehicle generally employed to transport illegal aliens, bore Texas plates, and did not appear heavily loaded, the characteristics of the vehicle itself did not provoke suspicion.

Thus the basis for Molina's suspicion of wrongdoing related exclusively to the Lincoln's passengers. It is now well-settled that a person's failure to establish or maintain eye contact with a surveilling agent is of no relevance whatsoever to the *Brignoni-Ponce* analysis. *United States v. Orona-Sanchez; United States v. Pacheco,* 617 F.2d 84 (5th Cir.1980); *United States v. Escamilla.* Nor do the driver's two brief and nervous glances at Molina over a prolonged period furnish a reasonable predicate for the agent's suspicion. *Compare United States v. Barnard,* 553 F.2d 389, 391–92 (5th Cir.1977) (court deemed suspicious the fact that the driver "glanced repeatedly and nervously at [an agent] as he

passed."). A speeding driver would be expected to look anxiously at a vehicle positioned alongside the highway. And any driver who persists in driving in close proximity to another vehicle should expect that the other driver will glance, whether nervously or otherwise, in his direction. One could hardly expect less. It is for precisely these reasons that we have held, " '[r]easonable suspicion should not turn on the ophthalmological reactions of the ... [suspect].' " *United States v. Pacheco,* 617 F.2d at 87 (*quoting from United States v. Lopez,* 564 F.2d at 712).

Finally, the peculiar posture of several passengers and the shabby, rumpled appearance of all occupants of the Lincoln, whether viewed individually or in the aggregate, do not justify the officer's action. Albeit relevant, the three passengers' unusual method of travel does not alone, or in combination with Agent Molina's other observations, reasonably warrant a suspicion of illegal activity, *United States v. Orona-Sanchez; United States v. Pacheco; United States v. Lamas,* particularly in light of Molina's admissions that he was unfamiliar with this form of concealment, and that these individuals could have more effectively escaped detection by crouching on the floor of the car. *See United States v. Pena-Cantu* (that (1) travelers were proceeding in a northerly direction away from Mexico toward Houston; (2) passengers were adult males of Hispanic appearance and did not look like tourists; (3) passengers in back seat were sitting low as if to avoid detection; and (4) subject vehicles were of a type often used in smuggling, deemed insufficient to justify investigatory stop); *United States v. Lamas,* (that a 1966 Ford, a vehicle not generally driven by tourists, with Colorado plates traveling north on Highway 180 in New Mexico, approximately 190 miles north of the Mexican border, appeared heavily loaded, and that the back-seat passengers crouched down as the agents' car passed, even when examined in light of the latters' knowledge that Highway 180 was a major smuggling route between Mexico and Colorado and was visited infrequently by tourists, and that 48% of the vehicles in which aliens had been discovered in this area bore Colorado plates, did not reasonably warrant agents' suspicion that vehicle contained illegal aliens).

Although the majority posits substantial reliance on Agent Molina's testimony that, based on his four years with the INS's anti-smuggling unit, the unwashed, unkempt and uncombed appearance of the Lincoln's passengers signaled their undocumented status, this factor does not serve to tip the balance in favor of a finding of reasonable suspicion. Persons returning home on a busy interstate highway after working or engaging in such legitimate recreational activities as hunting or camping might well present an equally disheveled mien. That the vehicle's occupants appeared to be of Latin origin is likewise of little or no significance in an area where a large percentage of the population is Hispanic. *See Orona-Sanchez.*

Upon consideration of the totality of the circumstances confronting Agent Molina, therefore, I cannot conclude that he could have reasonably entertained a suspicion that the Lincoln was used to transport undocumented aliens. Accordingly, I would affirm the judgment of the trial court suppressing evidence obtained as a result of the investigatory stop.