UNITED STATES of America,
Plaintiff-Appellee,

v.

Maria De Jesus GARCIA,
Defendant-Appellant.

No. 83–1447.

United States Court of Appeals,
Fifth Circuit.

May 11, 1984.

Rehearing and Rehearing En Banc
Denied June 28, 1984.

Dorothy Ann Flores (court-appointed), San Antonio, for defendant-appellant.

Sidney Powell, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before REAVLEY, TATE and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This appeal is brought by Maria De Jesus Garcia, who was convicted by a federal district court jury of four counts of aiding and abetting the transportation of undocumented aliens in her automobile in violation of 18 U.S.C. § 2(a) and 8 U.S.C. § 1324(a)(2). Garcia alleges that the district judge erred in refusing to suppress evidence which she says was obtained by the government as a result of an unconstitutional stop and search of her vehicle. Garcia also challenges the district judge's reading of a modified *Allen* charge to the jury, and the judge's refusal to allow post-trial interviews of jurors by defense counsel.

## THE STOP AND SEARCH

On February 18, 1983, United States Border Patrol agents Stanley Pruszenski and Alfred Baron were sitting in their marked border patrol sedan overlooking the northbound lanes of Interstate Highway 35 just south of Moore, Texas about 115 miles from the Mexican border. At approximately 11:30 p.m., Pruszenski and Baron spotted a pickup truck camper traveling northbound unusually slowly, its headlights angled up. The agents entered traffic to further observe the camper. They saw that its bumper was low, its tires "were squashed down," the wheel wells were covering part of the tires, and it was loaded heavily in the rear. The truck was weaving, it appearing "that the driver was having a hard time controlling the vehicle due to the weight in the back, making the front end light." When the agents pulled their car alongside the vehicle and shined a flashlight out of their window to illuminate the truck, they noticed that the windows of the camper shell were "completely fogged over." The agents testified that the night was cold, and that the fogged windows indicated to them that the camper shell contained living beings, perhaps people.

Pruszenski was driving the agents' patrol car. While traveling alongside the truck, Baron leaned out of the window of the patrol car and observed three females in the front seat of the truck cab and five or six men in the back seat. When Baron shined his flashlight into the cab, according to the agents, the male passengers attempted to conceal themselves by ducking and scrambling down below the window. The agents testified that the men's clothes and hair appeared unwashed, dirty and "very unruly and unkempt," a characteristic considered common to individuals who have recently spent time in the brush.

Their suspicion aroused, the agents stopped the camper for an immigration inspection. Upon questioning, the driver and several passengers admitted to the agents that they were Mexican citizens without immigration documents. After receiving this information, the agents then opened the rear window to the camper and found fourteen additional males lying down on the floor, all of whom admitted they were illegal aliens. The agents arrested Garcia, the owner of the camper, and Lourdes Rangel-Campos, the driver, and took the remaining passengers into custody.

Before trial, defense counsel moved to suppress evidence obtained by the government as a result of the stop and search of

Garcia's vehicle. Defense counsel also moved to extend the deadline for filing the suppression motion, which had already passed. Although the district court denied the extension motion, it allowed the defendant at trial to present evidence pertinent to the suppression motion, and made oral findings of fact regarding the constitutionality of the stop and search, concluding that they were proper. The government on appeal waives any objection to the timeliness of Garcia's suppression motion, and we consider it on its merits.

To justify the suppression of evidence in this case, we must consider first, whether there was a sufficient basis to stop Garcia's vehicle, and second, whether there was probable cause to permit the subsequent search of the camper compartment. *United States v. Gordon*, 712 F.2d 110, 112–13 (5th Cir.1983).

Both parties agree that because the investigatory stop in this case was made by a roving border patrol, the legality of the stop must be determined according to the principles articulated in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In that decision, the Court held that "except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with reasonable inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884, 95 S.Ct. at 2582. The Court stated that the following factors may be considered in determining whether a stop is justified: characteristics of the area in which the vehicle is encountered, including proximity to the border, usual traffic patterns, and history of illegal alien traffic; type and appearance of the vehicle, including whether it appears heavily loaded; behavior of the driver; and number, appearance, and behavior of the passengers. *Id.* at 884–85, 95 S.Ct. at 2581–82. These factors are not exclusive. *United States v. Melendez-Gonzalez*, 727 F.2d 407, 411 (5th Cir.1984). Rather, "the totality of the circumstances—the whole picture—must be

taken into account." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). *Accord, Brignoni-Ponce*, 422 U.S. at 885 n. 10, 95 S.Ct. at 2582 n. 10. "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting ... the particular vehicle they stopped was engaged in criminal activity." *Cortez*, 449 U.S. at 417, 421–22, 101 S.Ct. at 695, 696–97. "In all situations, the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Brignoni-Ponce*, 422 U.S. at 885, 95 S.Ct. at 2582.

This Court has repeatedly stated that a vital element of the *Brignoni-Ponce* test is whether the agent had "reason to believe that the vehicle [in question] had come from the border." *United States v. Lamas*, 608 F.2d 547, 549 (5th Cir.1979) (citations omitted). "We have found this element ... missing where the stop has occurred a substantial distance from the border." *Id. See, e.g., Melendez-Gonzalez* at 411 (sixty miles from border); *United States v. Pacheco*, 617 F.2d 84, 86 (5th Cir.1980) (on Interstate 35, eighty-five miles from border); *United States v. Lopez*, 564 F.2d 710, 712 (5th Cir.1977) (fifty-five miles from border).

In this case, Garcia's truck was stopped more than 100 miles from the United States-Mexican border, and neither Pruszenski nor Baron testified that they had any reason to believe the vehicle had crossed the border when they stopped it. Although Interstate 35 leads directly to the border, it passes through the city of Laredo, Texas and some seven other towns before reaching Moore. "The mere fact that a vehicle is proceeding on a public highway leading from the border but already past towns in this country is not sufficient cause to believe the vehicle came from the border." *Melendez-Gonzalez* at 411.

Although we find that the agents did not have sufficient information to reasonably suspect that Garcia's vehicle came from the border, the *Brignoni-Ponce* standard may still be satisfied "if other articulable facts

'reasonably warrant suspicion.'" *United States v. Escamilla,* 560 F.2d 1229, 1232 (5th Cir.1977); *Melendez-Gonzalez* at 411. We are required, however, to examine these facts charily. *United States v. Pena-Cantu,* 639 F.2d 1228, 1229 (5th Cir. 1981).' After a careful review of the record, we note that many of the factors deemed relevant in *Brignoni-Ponce* and its progeny are present in this case.

Baron testified without contradiction that border patrol agents had recently apprehended a number of illegal alien smugglers at or near the location where he and Pruszenski were stationed on February 28, and the evidence plainly supports the district court's unassailed findings that this segment of Interstate 35, as well as other highways also leading to the border that intersect it just south of where the agents initially observed the camper truck, are common smuggling routes. *See Brignoni-Ponce,* 422 U.S. at 884–85, 95 S.Ct. at 2581–82; *United States v. Payne,* 555 F.2d 475, 478 (5th Cir.1977); *United States v. Estrada,* 526 F.2d 357, 358 (5th Cir.1976) (per curiam). The evidence also adequately supports the district court's unchallenged finding that the agents knew that campers are used frequently for transporting illegal aliens. *See Brignoni-Ponce,* 422 U.S. at 885, 95 S.Ct. at 2582; *United States v. Lara,* 517 F.2d 209 (5th Cir.1975) (pickup truck with camper shell); *United States v. Gordon* at 112–13 (stake bed truck with concealed compartment). This Court also has relied upon an agent's observation, as was present here, that occupants of the vehicle were unwashed and unkempt. *See United States v. Salazar-Martinez,* 710 F.2d 1087, 1088–89 (5th Cir.1983). Moreover, the lateness of the hour substantially reduces the likelihood that those individuals were returning from outdoor work. These facts, coupled with those occupants' sudden, extensive, and active attempts to position themselves so as to evade detection,[1] gave reason for agents Pruszenski and Baron to

---

1. Garcia asserts that the passengers' allegedly evasive actions were *merely* attempts to avoid *eye* contact with the beam from the flashlight shined by Agent Baron into the truck cab. If Garcia's characterization of the facts is correct, then we must disregard these actions, because "the avoidance of eye contact can have no weight whatsoever" in the suspicion calculus. *United States v. Pacheco,* 617 F.2d 84, 87 (5th Cir.1980). Moreover, "[i]t is not unusual for one ... to be startled by lights being flashed suddenly into the interior of his vehicle." *United States v. Orona-Sanchez,* 648 F.2d 1039, 1042 (5th Cir.1981). Pruszenski and Baron testified, however, that the passengers in the back seat of the cab did *much more* than *merely* avoid *eye* contact with Baron's flashlight. Pruszenski testified that when the light was shone into the cab, "behind the [cab's front] seat, we could observe five or six people moving and slouching low as to get out of the light trying to hide." Baron, who was closer to the vehicle carrying the aliens, testified:

> "As soon as I turned on the flashlight, there was a male ... looking out the window in this crew cab. As soon as I turned on the flashlight, he ducked, and the rest of the men were making the biggest effort they could to conceal themselves where they could not be seen.
> " . . . .
> "They were scrambling around trying to get lower than the windows were so that ... I couldn't see them with the flashlight. They were scrambling around in the interior there."

The district judge believed the agents' undisputed testimony on this point, and it is not challenged on appeal. (We observe that in *Pacheco* the panel noted that though the testimony of all four aliens implicated the defendant, one testified he slept until the car stopped, another that he "sat up normally" until it parked off the road, and "none testified that they slouched in the car in an attempt to avoid detection." 617 F.2d at 86 n. 4.)

The testimony here plainly establishes that these actions are not an instance of a reflexive attempt to avoid a bright light, but rather an obvious effort to evade detection. *Cf. United States v. Salazar-Martinez,* 710 F.2d 1087, 1089 (5th Cir.1983).

That some of the passengers "were sitting low" was held insufficient to justify the stop in *United States v. Pena-Cantu,* 639 F.2d 1228, 1229–30 (5th Cir.1981). Such a static condition is one common to vehicle passengers. The same ruling was made in *Orona-Sanchez,* 648 F.2d at 1041–42, respecting the circumstance that, between the time the vehicle initially drove by the then stationary agents and the time the agents later caught up with and passed it, two of the passengers "had 'sort of slouched down'" so only the tops of their heads were visible to the passing agents. However, it was after dark and that character of change over several minutes to a more recumbent position by nighttime passengers is not unusual. Moreover, in *Orona-Sanchez* we gave "substantial weight to the fact that these agents were new to the area ...." *Id.* at 1042. In *United States v. Lamas,* 608 F.2d 547

suspect the presence of illegal aliens in Garcia's vehicle. *Id.* at 1089. Moreover, the agents had reason to believe that the camper shell contained a sizable living cargo: the camper appeared heavily loaded, *see Brignoni-Ponce,* 422 U.S. at 885, 95 S.Ct. at 2582; *United States v. Gandara-Nunez,* 564 F.2d 693, 694–95 (5th Cir.1977) (per curiam); *United States v. Sarduy,* 590 F.2d 1355, 1358 & n. 4 (5th Cir.1979) (cases cited),[2] and its windows were completely fogged over. *See United States v. Leyba,* 627 F.2d 1059, 1063–64 (10th Cir.), *cert. denied,* 449 U.S. 987, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980).

Without determining whether any of these factors is alone dispositive, we hold that Agents Pruszenski and Baron, considering the totality of the circumstances—

including the unusually heavy and overloaded appearance of Garcia's pickup camper, the fogged windows, the history of alien smuggling on this segment of Interstate 35 just above these other connecting roads to the border, the unwashed and very unkempt appearance of the passengers, their efforts to avoid detection by ducking and scrambling, the late hour,[3] and the unusually slow speed of Garcia's vehicle [4]—in light of their specialized experience and training,[5] reasonably could have an objective and particularized suspicion that Garcia's vehicle was then transporting illegal aliens. We therefore conclude that the stop of that vehicle did not violate the Fourth Amendment.

■ Once Garcia's vehicle was stopped, the agents were entitled to question its

(5th Cir.1979), we held the fact that "passengers in the back seat appeared to slouch down" as the vehicle passed the agents, while "certainly a suspicious reaction," was nevertheless not "on its own sufficient" to justify the stop. *Id.* at 549. In *Pacheco* we made the same holding respecting similar testimony that the passengers "'hunkered down' in the seat." 617 F.2d at 86–87. While the passenger conduct in *Lamas* and *Pacheco* is more suspicious than that in *Pena-Cantu* and *Orona-Sanchez,* it is clearly less suspicious than the more extensive, active, abrupt, and obviously evasive conduct described by the agents here. Ducking and scrambling around is certainly less typical of innocent passengers than slouching or hunkering down. *Cf. e.g., Salazar-Martinez,* 710 F.2d at 1089 (distinguishing *Orona-Sanchez* and *Pacheco* ). Because "[e]ach case must turn on the totality of the particular circumstances" in that case, *United States v. Brignoni-Ponce,* 422 U.S. 873, 885 n. 10, 95 S.Ct. 2574, 2582 n. 10, 45 L.Ed.2d 607 (1975), while we consider the clearly evasive actions of the passengers in Garcia's camper as a significant factor in justifying the stop, we need not determine whether it *alone* would suffice, other factors also being present here.

2. In *United States v. Orona-Sanchez,* 648 F.2d at 1042, and *United States v. Pacheco,* 617 F.2d at 86, this factor was given "little" or "no weight." In *Pacheco* the car's rear "rode low to the ground and appeared heavily loaded," and the car actually had five or six occupants. *Id.* In *Orona-Sanchez* it is merely said that the vehicle "appeared to have a heavy load"; there were three people in the cab and "several" in the camper. 648 F.2d at 1041. Here, by contrast, the testimony reflects a degree of loading that is more than merely "heavy" but is indeed obvious *over* loading (*e.g.,* not only low in the rear, but

to the extent that the vehicle weaves and headlights are noticeably angled up)—consistent with the some twenty-two people carried by the vehicle. Moreover, *Pacheco* and *Orona-Sanchez* are also distinguishable from the case at hand, in that the weaving and lowered rear of the truck and the fogged windows of the camper shell here indicated not only that the camper carried a most unusually heavy cargo, but that the cargo was breathing.

3. See *United States v. Estrada,* 526 F.2d 357, 358 (5th Cir.1976) (per curiam).

4. Garcia's vehicle was traveling at forty to forty-five miles per hour. Baron testified that it was unusual for vehicles to be traveling late at night at such a slow speed on that portion of Interstate 35. *Cf. United States v. Kreimes,* 649 F.2d 1185, 1190 (5th Cir.1981); *United States v. Sanchez,* 689 F.2d 508, 514 (5th Cir.1982).

5. Pruszenski and Baron each had received specialized training as border patrol agents, following which they served as agents in the area, including the location of the instant stop, covered by the Cotulla, Texas station, Pruszenski for a period of two years and five months, and Baron for slightly over three years, prior to the events in question. During this period of service, Baron had participated in approximately 150 separate incidents in which arrests were made for transporting illegal aliens, and Pruszenski had participated in approximately 100. Pruszenski had received training in Spanish, and spoke and understood it to a limited extent. Baron was a native Spanish speaker. As noted *supra,* we must consider the facts known to the agents in light of the agents' professional experience. *See, e.g., United States v. Kreimes* at 1189.

occupants about their citizenship and immigration status, "but any further detention or search ... [required] probable cause." *United States v. Brignoni-Ponce*, 422 U.S. at 881–82, 95 S.Ct. at 2580, quoted in *United States v. Melendez-Gonzalez* at 413.[6]

"It is well settled that probable cause to search an automobile exists when trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband. We must also be mindful that 'probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers. We weigh not individual layers but the "laminated" total.'" *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir.) (en banc), *cert. denied*, 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978) (citations omitted).

Once several passengers of Garcia's vehicle admitted to the agents that they were undocumented aliens, that fact, coupled with those observations suggesting that there were other individuals within the camper compartment, provided probable cause to search the camper for other illegal aliens. Thus, no Fourth Amendment violation resulted from either the stop or search of Garcia's vehicle, and her argument to that effect must fail.

## THE *ALLEN* CHARGE

■ Garcia launches a two-pronged attack against the modified *Allen* charge given to the jury below. First, she argues that use of any form of the *Allen* charge is coercive and thus violates the Sixth Amendment right to a fair trial. Second, she contends that the *Allen* charge, even if not inherently prejudicial, was unduly coercive in the context of this case.

At the outset, we note that "[i]t is well settled in this circuit that the *Allen* charge is permissible, within the limitations of our prior decisions." *United States v. Scruggs*, 583 F.2d 238, 240 (5th Cir.1978) (footnote omitted). Garcia does not attack the language of the *Allen* charge used below,[7] which "was well within these limi-

---

**6.** However, if the stop were lawful and if the agents had probable cause to believe that the vehicle was carrying illegal aliens, no warrant was required for their search of it. *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

**7.** The *Allen* charge given here was as follows:
"I know that you are attempting to discharge your duties in a conscientious manner. However, I want to charge you additionally at this time, that this, like any other case, is an important case.
"Your failure to agree upon a verdict will necessitate another trial. There is nothing to indicate that it can be better tried or presented at some other time any more exhaustively than it has been by both sides of the case during this trial. Also, you should consider that the case at some time must be decided, and that you were selected in the same manner and from the same source from which any future jury must be selected. There is no reason to suppose that the case will ever be submitted to a jury more intelligent, more impartial or more competent to decide it, or that more clear evidence will be produced on one side or [another].
"Now, it is your duty to decide the case if you can conscientiously do so. However, the Court does not want any juror to surrender

his or her conscientious conviction. Each juror should perform his or her duty conscientiously and honestly according to the law and the evidence, although the verdict to which the jurors agree, of course, must be his or her own verdict, the result of his or her own convictions, and not a mere acquiescence in the conclusions of other jurors. Yet, in order to bring twelve minds—in your case, ten minds—to a unanimous result, you must consider the matters submitted to you with candor and with a proper regard for and deference to the opinions of others. Thus, in conferring together, you ought to pay proper respect to each other's opinions with an open-minded disposition to be convinced by each other's arguments. You should not, any of you, adopt a stubborn, close-minded attitude toward your responsibilities here. It is important that you should arrive at a verdict one way or the other, but only, of course, according to your convictions. You must not, by reason of having taken a position at one time or another in the discussions, stubbornly adhere to that position without listening carefully to the others and reexamining your own views, as well as the suggestions and ideas expressed by the other jurors, keeping in view the ultimate goal of reaching a verdict in which you can conscientiously join. This is

tations." *Scruggs* at 241. In *United States v. Bailey*, 468 F.2d 652 (5th Cir. 1972), *aff'd en banc*, 480 F.2d 518 (5th Cir.1973), this Court rejected a general attack on the *Allen* charge as being inherently coercive in any form. *Id.*, 468 F.2d at 661, 480 F.2d at 518. *Accord, Scruggs* at 240–41. "This Court has repeatedly upheld the use of the modified *Allen* charge." *United States v. Jennings*, 724 F.2d 436, 437 (5th Cir.1984). Unless sitting *en banc*, we are bound by the prior decisions of this Court. *Bailey*, 468 F.2d at 668.

■ Garcia also argues that the *Allen* charge was particularly coercive as used in this case because the charge was given to the jury on a Friday afternoon, after the jury had twice indicated that it was deadlocked and that the dissenting jurors' decisions were irreversible.[8] Garcia contends the charge coerced the dissenting jurors, who Garcia presumes desired an acquittal, into voting to convict. The decision on whether the *Allen* charge should be given, and when it should be given, "is within the sound discretion of the trial judge." *Scruggs* at 241. We find no abuse of discretion here.

> very important, and I urge that you give full consideration to the matters which I have suggested.
> "Now, in making these statements, I again emphasize that no juror should surrender his or her conscientious conviction. The verdict arrived at, and to which each juror agrees, must be the verdict of each juror individually, the result of his or her own conclusions and convictions and not a mere acquiescence in the conclusion of others.
> "Now, I'm going to ask that you retire again and carefully consider all of the evidence in the light of the Court's previous instructions and after giving full and due consideration to the instructions I have now given you. The Court will wait for a further message from you after you have continued your deliberations."
> This charge is similar to that approved by this Court in *United States v. Cook*, 586 F.2d 572, 577 n. 1 (5th Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979).

8. The jury began its deliberations Friday at approximately 9:00 a.m. About one hour later, the jury sent a note to the trial judge requesting

Although "[t]he timing of the *Allen*-type instruction has occasionally been a factor in appellate review of the instruction's coercive effect," *Bailey*, 468 F.2d at 664 (citation omitted), this is not an occasion where the *Allen* charge was given prematurely, *see, e.g., Andrews v. United States*, 309 F.2d 127, 129 (5th Cir.1962), *cert. denied*, 372 U.S. 946, 83 S.Ct. 939, 9 L.Ed.2d 970 (1963), or where the verdict was delivered so soon after the charge as to indicate coercion. *See, e.g., Scruggs* at 241. Nor did the jury's statements on two occasions that it was deadlocked necessarily indicate that absent coercion, the dissenting jurors would not have changed their minds. To the contrary, the fact that the jury deliberated for approximately three hours after receiving the *Allen* charge and requested a clarification of the judge's initial instructions indicated that the jurors heeded the *Allen* charge's admonition to reexamine their own views and those of other jurors without surrendering their convictions.

Because we do not believe the carefully worded *Allen* charge given to the jury unduly coerced, threatened, or pressured dissenting jurors into surrendering their conscientiously held views, *see United States v. Skinner*, 535 F.2d 325 (5th Cir.

> information from outside the record. The request was declined. At about 11:30 a.m., the jury sent a note to the judge stating: "After deliberating for approximately 2 (two) hours we have not reached a unanimous decision. The jurors that are dissenting have indicated that their decision is irreversible." The judge denied a defense motion for mistrial and replied to the jury in a written note: "The court knows that the taking of the evidence required two days and believes that you should continue your deliberation. You are instructed to continue ... deliberation."
> Following a lunch break and another approximately ninety minutes of deliberation, the jury at about 2:00 p.m. again informed the district judge, in a note substantially identical to its prior one, that it was deadlocked. The judge then, over objections of defense counsel and a motion for mistrial, read the modified *Allen* charge to the jury. At about 4:45 p.m., the jury asked the district judge for more clarification of the terms "reasonable doubt" and "common sense." The judge then repeated a portion of his original instructions to the jury. About forty-five minutes later, the jury returned its guilty verdict.

1976) (per curiam), *cert. denied,* 429 U.S. 1048, 97 S.Ct. 756, 50 L.Ed.2d 762 (1977), we hold use of the charge in this case was proper. *Cf. United States v. Jennings* at 447.

## QUESTIONING OF JURORS

■ Garcia's final contention is that the district court erred in refusing to allow her to conduct post-verdict "discovery" through juror depositions and interrogatories in order to determine whether the jurors were coerced by the *Allen* charge.

"Historically, interrogations of jurors have not been favored by federal courts except where there is some *showing* of illegal or prejudicial intrusion into the jury process." *United States v. Riley,* 544 F.2d 237, 242 (5th Cir.1976), *cert. denied,* 430 U.S. 932, 97 S.Ct. 1554, 51 L.Ed.2d 777 (1977) (emphasis in original). *Accord, United States v. Davila,* 704 F.2d 749, 754 (5th Cir.1983). The only intrusion alleged here was the giving of the *Allen* charge to the jury, which we have held was not error. That is not the type of "illegal or prejudicial intrusion into the jury process" that might justify post-verdict interviews of jurors.

In *United States v. Vincent,* 648 F.2d 1046 (5th Cir.1981), this Court upheld a district court's refusal to conduct a post-verdict hearing on whether the jury was coerced by a properly given *Allen* charge, noting that "the only questions that would have been asked would have concerned the

juror's internal mental processes in reaching the verdict." *Id.* at 1050. Here too, defense counsel's only purpose for seeking to interview jurors was to probe the jury's "process of deliberation and find out how and why the jury reached its verdict. That is the one form of attack on a verdict that has always been forbidden in Anglo-American criminal law." *United States v. D'Angelo,* 598 F.2d 1002, 1004 (5th Cir.1979).[9] The trial judge did not abuse his discretion by denying Garcia's motion to interview jurors.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

TATE, Circuit Judge, dissenting:

A pickup truck was stopped at about 11:30 p.m. by border patrol agents on an Interstate Highway in Texas some 115 miles north of the Mexican border. So far as the agents were able to glimpse, there were three women in the front seat of the truck cab and five or six men in the back seat. To the pickup truck was affixed a heavily loaded camper attachment. The essential issue concerns the lawfulness or not of the stop of this vehicle. Believing that, stripped to its essence, the stop was based upon no more than the border patrolmen's speculation that poor and dirty Hispanic appearing persons might possibly be Mexican aliens who had crossed the border illegally some 115 miles south of the stop, and that "reasonable suspicion" of illegal alien entry cannot be based upon the mere cir-

**9.** In denying Garcia's motion for post-verdict discovery, the district court relied primarily on the fact "that any information [Garcia] might obtain from jurors through 'discovery' would be inadmissible under Rule 606(b) of the Federal Rules of Evidence," which reads:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict ... or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside

influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes."

"A valid argument may be made that any post-trial questioning of jurors (for the purpose of impeaching the verdict) should be ... restricted to those matters found by the [trial] court as both relevant and proper under" Rule 606(b). *United States v. Davila,* 704 F.2d 749, 754–55 n. 8 (5th Cir.1983). On appeal, Garcia appears to concede the applicability of Rule 606(b) to her request for post-trial questioning of jurors, but claims the rule is overbroad. We find this contention to be without merit here.

cumstance that a crowded pickup truck of dirty appearing Hispanic-descended workmen is traveling on an Interstate highway at 11:30 in the evening, I must respectfully dissent from the majority opinion, which, I concede, is excellent and thorough and has fairly presented the factual picture.

I.

The essential issue facing this court today is whether roving border patrol agents may stop persons who appear to be of Hispanic descent and who appear to be poor and dirty, wherever and however spotted, because those agents claim to have the "expertise" to distinguish between the characteristics of those travelers who are illegal aliens and those who are lawfully present in the United States. Quite unfortunately, we have the opportunity only to review the successful guesses of these agents; we are never presented with the unconstitutionally intrusive stops of Hispanic residents and citizens that do not result in an arrest. Differentiating the United States from police states of past history and the present, our Constitution in its Fourth Amendment prohibition against unreasonable searches protects all our residents, whether middle-class and well-dressed or poor and disheveled, from arbitrary stop by governmental enforcement agents in our travel upon the highways of this nation.

The perceived social problem in controlling the hordes of illegal migrants from Mexico, does not, in my opinion, justify stopping people of Hispanic-descent appearance far from the border, simply because the hour is late and they appear to be poor and dirty working people, any more than it would justify the similar arbitrary stop of any native-born or naturalized American simply because he has the same characteristics of appearance. A few of the decisions of this circuit that have upheld stops by immigration agents have come perilously close to ignoring this fundamental constitutional concept, in relying upon one slight circumstance or another, in conjunction with the totality of its context, as

entitling these agents to a stop-justifying "reasonable" suspicion. In the present instance, based upon an addition of some slight circumstances relied upon in these other scattered decisions, not of themselves sufficient (out of their context) to justify reasonable suspicion, the majority nevertheless finds the stop justified, although in the present context these circumstances do not add up to reasons justifying reasonable suspicion of illegal entry.

To its credit, the panel majority has tried to apply the precedents of this circuit in a principled way to the present facts. I am afraid, however, that this attempt has only succeeded in differentiating otherwise irreconcilable precedent of this circuit through an unsteady calculus of what factors may permissibly be considered when determining whether border patrol agents have an objectively "reasonable suspicion" to make a stop. With great respect for the views of my brethren in the majority, I must dissent.

II.

The majority correctly notes that this stop by a roving border patrol requires the application of the multi-factorial test of *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975). Accordingly, we must assess the lawfulness of the stop in light of the totality of the circumstances known to the officers at the time of the stop. *Brignoni-Ponce*, 422 U.S. at 885 n. 10, 95 S.Ct. at 2582 n. 10. A vital element of this test is whether the agent who made the stop had "reason to believe that the vehicle [in question] had come from the border." *United States v. Lamas*, 608 F.2d 547, 549 (5th Cir.1979). The defendant Garcia was stopped on an interstate highway in Texas 115 miles north of the Mexico/United States border. As the majority candidly admits, nothing in this case suggests that the agents had any reason to believe that Garcia's truck had come from the border.

In the absence of an inference that the vehicle to be stopped came from the border, the remaining factors known to the

agents must be carefully examined to determine whether "other articulable facts 'reasonably warrant suspicion'". *United States v. Pena-Cantu*, 639 F.2d 1228, 1229 (5th Cir.1981). In the present case, the remaining factors relied upon by the majority included: other illegal aliens had been seized near the location where the agents encountered Garcia; the interstate highway on which Garcia was traveling was "a common smuggling route"; the occupants of Garcia's truck were unwashed and unkempt; the type of truck driven by Garcia, a pickup truck with a camper shell attached to the back of it, is often used to transport illegal aliens; the windows of the camper shell attachment appeared to be fogged, suggesting that the camper carried living cargo; the lateness of the hour at the time of the stop; the scrambling of the occupants of the truck when the border patrol agent shined his flashlight at them; the seemingly heavy load in the truck; the speed of the truck; and the specialized training of the border patrol agents involved in the stop. Because I believe that the consideration of several of these factors departs from the precedents of this circuit, despite the majority's distinguishment of them as not controlling, and that the remaining factors cannot, standing alone, support the stop of Garcia's truck, I cannot join the opinion of the panel majority, excellently reasoned as it is.

The majority notes that a relevant consideration in its analysis was the apparent heavy load carried by Garcia's truck. Although we have been loath to give any weight to the "heavy load" factor in the past, *see United States v. Orona-Sanchez*, 648 F.2d 1039, 1042 (5th Cir.1981) (stop held illegal, under facts quite similar to the present); *United States v. Pacheco*, 617 F.2d 84, 86 (5th Cir.1980), the majority offers the distinction that "here, by contrast,

the testimony reflects a degree of loading that is more than merely heavy, but is indeed *over* loading." (Maj. op. at 1225 n. 2).

As an initial matter, the distinction between "heavy-loading" and "overloading" is dubious and more semantic than real. More importantly, however, the rejection of "heavy" or "over"-loading as a factor rests on considerations of substance, not of degree. The factor is irrelevant as a consideration to support reasonable suspicion because a "heavy load" is just as consistent with innocent conduct, *e.g.*, a heavy load of produce or livestock, as it is with culpable conduct, *e.g.*, smuggling illegal aliens, especially when we cannot infer that the truck in question had come from the border.[1]

We have also refused to accord weight to the observations of border patrol agents that a vehicle's occupants "hunkered down" when the agents passed or were sitting low so as to avoid detection, *see United States v. Pacheco*, 617 F.2d 84, 86–87 (5th Cir.1980); *United States v. Pena-Cantu*, 639 F.2d 1228, 1229–30 (5th Cir.1981), or that the occupants of a vehicle were startled by the beam of a border patrol agent's flashlight. *United States v. Orona-Sanchez*, 648 F.2d 1039, 1041–42 (5th Cir.1981). The majority reasons that these decisions are inapposite since the occupants of Garcia's truck "did *much more* than *merely* avoid *eye* contact with [the agent's] flashlight." (Maj. op. p. 1224 n. 1). The agents testified that the occupants were "moving and slouching low as to get out of the light trying to hide." Agent Baron testified that, after he shined his flashlight into the truck, "they were scrambling around trying to get lower than the windows were so that ... I couldn't see them with a flashlight. They were scrambling around in the interior there." The

---

1. Other factors also persuade the majority of the relevance of the heavy-load factor, such as the squashed tires of the truck, the angle upward of the truck's headlights, the slow speed of the truck, and the weaving of the truck. While it is true that a heavy truck may have squashed tires and angled headlights and be difficult to manuever, these facts have no bearing on the basic

principle that operating a heavily loaded truck is no more consistent with guilty conduct than it is with innocent conduct. It is also possible, of course, that the tires may have been under-inflated and that the headlights were improperly aligned, indicating the questionable relevance of these factors when viewed "charily", as our precedents require.

majority considered this testimony relevant since "ducking and scrambling around is certainly less typical of innocent passengers than slouching or hunkering down." (Maj. op. p. 1225).

A factor affecting the lawfulness of a stop should not rest on the subtleties of the difference, if indeed there is one, between "ducking and scrambling" and "slouching and hunkering down." The essence of the majority's distinction unfortunately rests not on the physical actions of the occupants of the truck, which can be observed by border patrol agents, but on the motives for which the occupants took those physical actions (their desire to hide), something which could not be observed by the agents. The "undisputed" testimony of the agents was that this "ducking and scrambling" took place immediately after they had shined their flashlight into the dark cabin of the truck. The physical reactions of the occupants may have been a response to the beam of the flashlight, a circumstance which the majority concedes would render their conduct irrelevant. *See United States v. Lopez*, 564 F.2d 710, 712 (5th Cir.1977) (finding that "reasonable suspicion should not turn on the ophthalmological reactions of the appellant"). Of course, the agents here also testified that an additional *motive* of the occupants' actions (beyond reacting to the light) was "to conceal themselves" so as to avoid detection.

I am unwilling to believe that, based upon a fleeting moment of observation, border patrol agents are able to accurately assess that the occupants of a vehicle are "trying to hide" rather than reacting to a bright light. Furthermore, I cannot distinguish the "ducking and scrambling" in this case from the "slouching and hunkering down" that we previously refused to consider as a factor supporting the reasonableness of a stop. *See Pacheco, supra*, 617 F.2d at 86–87; *Pena-Cantu, supra*, 659

F.2d at 1229–30. Where, as here, a great deal of physical movement occurs in the interior of a vehicle at night immediately after a bright flashlight is directed at the occupants, I cannot in a "chary" review of the facts (as required where the stop is made miles and miles from the border, see decisions cited, *supra*) conclude that the truck occupants' reaction to the beam of the agent's flashlight should be weighed as a significant factor supporting a reasonable suspicion that the truck was transporting aliens.

Another factor relied upon by the majority is also, in my view, unworthy of meaningful weight. The court refers to the lateness of the hour as a relevant consideration adding to reasonable suspicion. We have held, however, that a "decision to travel such roads at less busy hours should not be the difference—constitutionally speaking—determinative of the right of the officers to stop vehicles." *United States v. Frisbie*, 550 F.2d 335, 338 (5th Cir.1977).

Admittedly, however, other factors relied upon by the majority perhaps do merit consideration, *e.g.*, the previous experience of the agents with illegal alien traffic on the highway, the type of vehicle driven by Garcia, and the unkempt appearances of the truck's occupants.[2] Carefully weighing these remaining factors, I conclude that the officers had insufficient articulable facts to support a reasonable suspicion that the truck driven by Garcia was transporting illegal aliens. Foremost among my concerns are (1) the distance between the border and the point at which the stop occurred, and (2) my hesitation to credit the ability of border patrol agents to distinguish an illegal alien from a lawful resident, based on physical appearances, after a few quick glimpses while traveling at considerable speeds on a highway.

---

**2.** Under the circumstances of this case, I can attribute no weight to the officers' observance that the windows of the camper shell on the truck appeared to be fogged. Under a cautious view of the facts I simply cannot infer that the appearance of a fogged window on a cold night would be caused solely by living, breathing cargo. Even if I were to accept that inference, I cannot find any basis for the further conclusion that the living cargo was human and illegally attempting to enter the United States.

That the highway on which Garcia was stopped and that the type of truck she was driving are commonly used for the smuggling of aliens must be insufficient, standing alone, to support reasonable suspicion for a stop, unless, of course, we are willing to permit all vehicles commonly used for smuggling (of which there are an increasing number) to be stopped at any distance over 115 miles from the border on designated highways—subject only to the discretion and availability of border patrol agents. The controlling factor in this case, if the stop was lawful, must be the unkempt appearance of the truck's occupants, which is alleged to be consistent with the appearance of illegal aliens. In short, we must rely on the ability of a border patrol agent to discern whether the appearance of the Hispanic occupants of a given vehicle are more or less like that of the typical illegal alien, rather than that of any other poor and disheveled American of Hispanic descent. I cannot accord controlling weight to this factor.

Whether a person appears "dirty" or "unkempt" varies greatly with the subjective perceptions of the person making the assessment. The standard will differ with each agent's experience and attitude about the typical appearance of an illegal alien. While I concede that this factor is worthy of some consideration, I cannot contribute controlling weight—in the sense of the constitutionality of a stop—to the hygienic ap-

pearances of a vehicle's occupants as interpreted by border patrol agents.[3]

I do not mean to suggest that this combination of factors (the reputation of the highway as a common smuggling route, the type of vehicle driven by the defendant, and the appearance of the vehicle's occupants) could never constitute reasonable suspicion for a stop by border patrol agents if at a distance closer to the border than that involved here. Nonetheless, when a vehicle is traveling 115 miles from the border and no permissible inference can be made that it came from the border, I conclude that the factors presented to this court that are worthy of consideration in light of the precedents of this circuit, as I view them, cannot rise to the level of reasonable suspicion without also subjecting innocent persons who lawfully reside in this country to intrusive stops by border patrol agents based primarily on their appearance as being of Hispanic descent.

*Conclusion*

For these reasons, and with great respect for the contrary views of my brethren, I dissent.

---

**3.** The majority notes that all of the relevant factors must be viewed in light of the specialized experience and training of the border patrol agents. To the extent that the experience of these agents contributes to the assessment of particular highways as smuggling routes and particular vehicles as common modes of transporting aliens, it is indeed a factor which we must consider. *See Brignoni-Ponce, supra,* 422 U.S. at 885, 95 S.Ct. at 2582. On the other hand, the subjective knowledge or beliefs of the border patrol agent can add nothing to our objective determination of whether the officer had reasonable cause to stop the vehicle. As we stated in *United States v. Lamas,* 608 F.2d 547, 548 (5th Cir.1979),

We have little difficulty in accepting as a fact that [the agent] honestly believed the car to be carrying illegal aliens. Indeed the conviction of the appellant on four counts of violating 8

U.S.C. § 1324(a)(2) is evidence of the absolute correctness of his belief. If the reasonableness of a stop depended on the border patrol agent's subjective beliefs our inquiry would end here. The Fourth Amendment, however, requires us to test this stop in a different manner.

*See also United States v. Melendez-Gonzalez,* 727 F.2d 407, 412 (5th Cir.1984). Thus, I am unable to derive any support for the stop from the majority's description of the expertise of the agents, the number of arrests in which they have participated, or their ability to speak Spanish. These facts do not enhance the other facts relied upon by the majority, nor do they persuade me of the agents' superior ability to distinguish illegal aliens from lawful residents—at least without evidence showing the number of erroneous stops made by these same agents.