UNITED STATES of America,
Plaintiff–Appellee,

v.

Jose Samuel DIAZ, Defendant–
Appellant.

No. 91–8644.

United States Court of Appeals,
Fifth Circuit.

Oct. 30, 1992.

Gregory K. Zaney, Austin, Tex., for defendant-appellant.

Joseph H. Gay, Jr., Richard L. Durbin, Jr., Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before POLITZ, Chief Judge, JOHNSON and JOLLY, Circuit Judges.

POLITZ, Chief Judge:

Jose Samuel Diaz appeals his convictions for unlawfully harboring and transporting an undocumented immigrant, 8 U.S.C.

§ 1324(a)(1)(B), (C), conspiring to possess an unlawfully obtained Alien Registration Receipt Card, 18 U.S.C. § 371 and 18 U.S.C. § 1546(a), and receipt of a bribe by a public official, 18 U.S.C. § 201(b)(2)(A). He also appeals his sentence. Concluding that Diaz's vehicle was stopped without reasonable suspicion, and that his motion to suppress should have been sustained, we reverse his convictions.

### Background

Diaz, a U.S. Border Patrol agent, was working at the Eagle Pass, Texas checkpoint when Ofelia Ortiz–Noriega, a Mexican national without proper papers, was found on a bus bound for Dallas. Ortiz–Noriega was processed for voluntary return and Diaz was directed to take her back to Mexico. He took her instead to his home where she performed cleaning services and had sexual relations with him. The following evening, after paying his charge $33 for her services, Diaz undertook to drive Ortiz–Noriega to San Antonio, from whence she was to catch a bus to Dallas.

Border Patrol agents Carlos Alberto Castro and Jose Armando Sifuentes were working roving patrol duty that evening. Their marked unit was parked on the shoulder of the San Antonio highway, with lights off, facing west, at about 9:10 p.m., when they observed an eastbound car approaching rapidly. They waited, planning to turn on their headlights when the car reached them so that they could observe the vehicle and its passengers. Before they turned on their lights, however, the driver of the other car flashed his high beams, momentarily blinding them. Thereafter the vehicle either swayed to the right or rounded a curve. The agents started up and followed. The eastbound vehicle slowed from an estimated 75 to about 40 miles per hour as the agents overtook it. The agents turned on their flashing lights

and the eastbound vehicle pulled over. Diaz and Ortiz–Noriega were its occupants. Ortiz–Noriega presented a temporary resident card in the name of another person which Diaz had given her. Both were arrested.

Diaz was indicted for harboring and transporting an undocumented immigrant, conspiring to possess an unlawfully obtained Alien Registration Receipt Card, and receipt of a bribe by a public official. He moved to suppress the evidence resulting from the encounter on the highway, including the identity and status of Ortiz–Noriega, contending that Castro and Sifuentes lacked reasonable suspicion to stop his vehicle. After a hearing the district court denied the motion. Diaz was convicted by a jury on all counts, was sentenced, and timely appealed.

### Analysis

In reviewing a district court's ruling on a motion to suppress we accept findings of fact unless clearly erroneous but review *de novo* the ultimate conclusion as to the constitutionality of the law enforcement action.[1] Although we reject Diaz's objections to the district court's factual findings,[2] we nonetheless conclude that the facts as found by the court did not justify the stop.

■ The fourth amendment allows Border Patrol agents on roving patrol to stop "vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." [3] In assessing the evidence, we look to the totality of circumstances as understood by those "versed in the field of law enforcement," seeking grounds for reasonable suspicion "that the particular individu-

---

1. *United States v. Casteneda,* 951 F.2d 44 (5th Cir.1992).

2. Diaz maintains that the agents were driving west when he passed them, driving east. The district court's finding that the agents were parked on the shoulder of the road is a permissible view of the evidence and hence not clearly

erroneous. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *see also Casteneda, supra.*

3. *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607, 618 (1975); *see also Casteneda, supra.*

al being stopped is engaged in wrongdoing."[4]

 The composite picture painted by the government has three elements: the location of the stop, the weather, and Diaz's behavior in flashing his high beams as he neared the patrol unit and slowing down after the unit began following.[5] According to the Border Patrol agents, three roads from the border converge near the place on U.S. Highway 57 where Diaz was stopped; many prior stops and arrests had been made on this stretch of road which was about 70 miles from Mexico. On the night in question it was raining. According to agent Castro, rainfall caused undocumented immigrants to come out of the brush and onto the road, where they tried to hitch a ride or awaited relatives. The cars in which aliens traveled in these circumstances were not typical of those used for smuggling, Castro testified; because the arrangements typically were impromptu any vehicle that was available would be used. Against this backdrop, Diaz flashed his high beams about 20 to 25 yards before he reached the patrol unit, ostensibly blinding the officers. Castro testified that in his experience approaching cars usually flash their high beams at a greater distance. Further, Diaz slowed to an estimated 40 miles per hour after the agents started in pursuit. If Diaz had slowed to 55 miles per hour, Castro testified that he would not have made the stop. The additional 15 miles per hour drop in speed, however, purportedly caused the agents to fear a "bail out," a maneuver the agent described as one in which the car drives off the highway, through a fence, into the brush, and the undocumented persons immediately scatter. We reject the government's contention that these facts amount to grounds for reasonable suspicion.

We previously have held that merely being on a road frequently used for illegal activity is insufficient to justify an investigative stop.[6] Were we to rule otherwise, law enforcement agents would be free to stop any vehicle on virtually any road anywhere near the Texas–Mexico border. Nor do rain and the perception that undocumented persons leave the cover of the brush for the roads during such weather present grounds to suspect any particular vehicle. Further, we find nothing unusual about a driver putting his lights on bright as he nears an unlighted vehicle parked on the shoulder of the road, particularly on a dark, moonless night. The driver may have failed to notice that vehicle sooner or perhaps he merely wanted a better look as he neared it.[7] Finally, there is nothing suspicious about a speeding car slowing down after a marked patrol unit turns to follow, with or without flashing lights. Rather than unusual, that is an expected reaction. As agent Castro testified, the logos on the side of his unit and its overhead lights made its status as a law enforcement vehicle apparent. A driver speeding past such a vehicle would reflexively slow down. Once he saw the patrol unit turn and follow, one might expect the driver to slow even more. The agents conceded that Diaz took no other action indicative of an intent to leave the road for a "bail out." The government argues that these factors should be viewed in their entirety and "as a whole" and that the

---

**4.** *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981).

**5.** In his suppression hearing testimony, agent Castro gave little weight to his observation that Diaz either swayed to the right or rounded a curve immediately after passing the patrol car. This observation was too indefinite to justify anything more than continued observation. Similarly de-emphasized by Castro, with good reason, were the tinted windows on Diaz's car; tinted windows are common.

**6.** *Casteneda, supra.* Here, the likelihood that any particular car carried an undocumented immigrant was lessened by the fact that local roads from Texas towns intersected Highway 57 west of the spot where Diaz was stopped. Accordingly, the highway carried local traffic to San Antonio as well as traffic from Mexico. *See United States v. Melendez–Gonzalez,* 727 F.2d 407 (5th Cir.1984).

**7.** Agent Sifuentes testified that Diaz had his bright lights on when the agents first observed him, then switched to his low beams and then flashed his brights as he reached their vehicle. This is not suspicious conduct; for safety reasons, a driver might want a clear view of an object on the side of the road as he passes it.

totality of the circumstances provided reasonable suspicion for the stop. We disagree. Just as each factor in and of itself was not unusual, the factors taken together as a whole are not unusual and do not provide an adequate level of suspicion for the agents to stop a vehicle. It would be unreasonable to subject the traffic in the border area to investigatory stops on the basis of the factual scenario presented herein.[8] Accordingly, we conclude that the circumstances attested to, considered as a whole, did not reasonably warrant suspicion that Diaz's vehicle was engaged in smuggling aliens. The motion to suppress should have been granted. Without the suppressed evidence the convictions lack the requisite support.

Because of our disposition of this appeal, Diaz's motion to supplement the record with his Objections to Presentence Report is denied as moot.

The convictions are REVERSED.

---

8. *See United States v. Abdon–Limas,* 780 F.Supp. 773 (D.N.M.1991) (no reasonable suspicion for roving border patrol stop 70 miles from Mexico where car had out-of-state license tags, occupants appeared Hispanic, none looked at patrol vehicle as it passed and car slowed "tremendously" to 30 to 35 miles per hour).