**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 92-1809

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE HIPOLITO CHAVEZ-VILLARREAL,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas

(September 21, 1993)

Before POLITZ, Chief Judge, REYNALDO G. GARZA and JOLLY, Circuit Judges.

POLITZ, Chief Judge:

Convicted of possession with intent to distribute marihuana and an associated firearms offense, Jose Hipolito Chavez-Villarreal appeals denial of his motion to suppress. Finding that the inculpatory evidence was the fruit of an illegal stop, we vacate and remand.

## Background

Shortly before 9:00 a.m., Border Patrol Agent Gerald R. Vonn was monitoring eastbound traffic on Interstate 40 twelve miles west

of Amarillo, Texas and 350 miles north of the Mexican border. The Border Patrol outpost in the Amarillo-Lubbock area, which Vonn supervised, annually apprehended over 1,000 undocumented aliens on this stretch of interstate highway. A major artery spanning the country, Interstate 40 also carried heavy volumes of legitimate traffic; Vonn, an experienced agent familiar with the area, characterized it as "one of the most heavily used routes in the United States."

On this particular day Vonn was called out to assist agents who had apprehended a group of persons smuggled across the border. While the agents completed paperwork Vonn observed traffic. All of the agents' vehicles were parked under an overpass; Vonn had an unmarked car and the other agents were in two patrol cars with insignia and overhead lights. There was a low spot in the highway 100 yards west of the overpass; eastbound vehicles could not see the officers' vehicles until driving through the low spot.

An older model Suburban with dark tinted windows drew Vonn's attention. Vonn recognized the Suburban as the type of vehicle used to carry undocumented persons but he also knew that Suburbans are a very popular vehicle in West Texas. Using his binoculars Vonn saw the occupants of the Suburban were a driver and a passenger. As the Suburban passed, however, Vonn could see only the driver, who had a rigid demeanor and looked straight ahead. The vehicle displayed Arizona license plates, a state considered to be one of the states of origin of smuggling expeditions. Vonn decided to follow the Suburban.

2

The Suburban began to change lanes and speeds, slowing down, then speeding up. It did not, however, exceed the speed limit. As Vonn pulled alongside the passenger sat up. The driver, an Hispanic male, continued to look straight ahead. Vonn decided to stop the vehicle.

Upon request for proof of citizenship the two occupants presented Vonn with their alien registration cards. The driver was Chavez-Villarreal; the passenger was a 15-year old boy. Vonn noticed a lumpy sleeping bag in the back of the Suburban which could have hidden another occupant. Retaining the alien registration cards, Vonn asked and received permission from Chavez-Villarreal to look inside. As he inspected the sleeping bag he felt a soft-sided suitcase, saw a rifle and ammunition, and smelled chili powder, sometimes used to mask the odor of marihuana. Suspecting that he had found controlled substances Vonn called for back-up.

When help arrived Vonn informed Chavez-Villarreal of his suspicions, gave him **Miranda**[1] warnings and asked permission to search the Suburban. Chavez-Villarreal again consented, this time signing a written consent form. Over 88 pounds of marihuana were discovered. Chavez-Villarreal was arrested. During processing he told Vonn that he had agreed to drive the marihuana from Phoenix to a rest area near Amarillo for $1,500 to $2,000. The 15-year old passenger was released when Chavez-Villarreal insisted that the boy

___

[1]**Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

3

was along only to keep him awake during the overnight drive and knew nothing about the contraband.

The grand jury handed up an indictment charging Chavez-Villarreal with violating 21 U.S.C. § 841(a)(1), possession with intent to distribute marihuana, and 18 U.S.C. § 924(c)(1), use of a firearm in connection with a drug trafficking offense. He moved to suppress the evidence seized in the search, including the marihuana, and the statements that he had made after his arrest. That motion was denied and Chavez-Villarreal entered a conditional plea of guilty, reserving his right to appeal the denial of his motion to suppress. After sentencing he timely appealed.

## Analysis

We employ a two-tier standard in reviewing denial of motions to suppress, reviewing the district court's factual findings for clear error and its ultimate conclusion as to the constitutionality of the law enforcement action **de novo**.[2] Applying this standard, we conclude that the district court erred in finding the stop of Chavez-Villarreal's vehicle constitutional. Finding the stop legal the district court did not address whether the subsequent consent to search was the fruit of unlawful conduct. Having before us an adequate record, in the interests of judicial economy we reach this issue and hold that the consent was tainted by the unconstitutional stop, poisoning the fruits of the subsequent search.

---

[2]**United States v. Diaz**, 977 F.2d 163 (5th Cir. 1992).

4

1.  Legality of the stop.

The fourth amendment permits a Border Patrol agent to select a particular vehicle for a stop only upon reasonable suspicion that the occupants are engaged in or about to engage in criminal activity.[3] We assess the basis for a stop not by isolating any component factor, each of which may indicate wholly innocent behavior standing alone, but by examining the entire picture,[4] which must yield articulable and objective manifestations of particularized suspicion.[5]

The picture presented by the record is that of an Hispanic man cautiously driving a popular older model vehicle on a major interstate highway, 350 miles from the Mexican border, at 9:00 a.m. with a companion who briefly slumped in his seat. After an unmarked vehicle dropped in behind, he switched lanes, slowed down, then resumed a speed within the legal limits. We are not persuaded that these circumstances gave rise to a reasonable suspicion of criminal activity.

Of "vital" importance,[6] Vonn could not infer from the location of the vehicle that it came from the border. Nor do the prior numerous incidents of arrests on Interstate 40 avail; the legitimate traffic on the highway was so heavy that the probability

---

[3]**United States v. Cortez**, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed. 2d 621 (1981).

[4]**United States v. Sokolow**, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed. 2d 1 (1989).

[5]**Cortez**.

[6]**United States v. Garcia**, 732 F.2d 1221, 1223 (5th Cir. 1984).

5

that any particular vehicle was smuggling an undocumented person was exceedingly slight.[7] That the passenger slouched in his seat as the Suburban approached the underpass could suggest that he was trying to hide, but such an inference is at least partially dispelled by the fact that he sat erect as Vonn's car drew abreast. Because passengers commonly slump in their seats to rest, we have required a more affirmative indication of an attempt to hide.[8] We find nothing suspicious about a driver changing lanes and slowing down when he realizes a vehicle approaching from the rear; that is a normal reaction if the driver wishes to let the tailing vehicle pass.

Further, we accord no weight to Chavez-Villarreal's failure to look at the patrol cars[9] and very little to his Hispanic appearance; his license plates indicate that he was from a state with a substantial Hispanic population.[10] Nor are we disposed to recognize an inference of criminal conduct from the Arizona tags; it cannot be gainsaid that a substantial amount of legitimate traffic from Arizona travels on Interstate 40 in West Texas.[11] The

---

[7]For the same reason, we cannot accept presence on the road at 9 a.m. as grounds for suspicion, even though, as Vonn testified at the suppression hearing, traffic leaving border areas in Arizona at midnight would be expected to arrive in Amarillo at mid-morning.

[8]Compare **Garcia** with **United States v. Lamas**, 608 F.2d 547 (5th Cir. 1979).

[9]**United States v. Cardona**, 955 F.2d 976 (5th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 381, 121 L.Ed. 2d 291 (1992).

[10]**United States v. Orona-Sanchez**, 648 F.2d 1039 (5th Cir. 1981).

[11]See **Lamas**.

stop herein violated the fourth amendment.[12]

2.  Validity of the Consent.

Chavez-Villarreal consented to both of the searches that ultimately revealed the marihuana and resulted in his arrest. Therefore our finding of an illegal stop does not definitively determine whether the evidence derived from the subsequent searches must be excluded.  Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation.[13]

The admissibility of the challenged evidence turns on a two-pronged inquiry: whether the consent was voluntarily given and whether it was an independent act of free will.  The first prong focuses on coercion, the second on causal connection with the constitutional violation.  Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will. To determine whether the causal chain was broken, we consider: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and

---

[12]We are aware of our decision in **United States v. Ramirez-Lujan**, 976 F.2d 930 (5th Cir. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1587, 123 L.Ed. 2d 153 (1993), to admit evidence obtained in a contested stop under the good faith exception to the exclusionary rule.  The government does not argue the good faith exception here; it does not apply.  Unlike **Ramirez-Lujan**, the stop in the instant case did not take place on a border road whose usual travelers were known on an individual basis by the Border Patrol agent.

[13]**Brown v. Illinois**, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed. 2d 416 (1975).

7

flagrancy of the initial misconduct. The burden of showing admissibility rests on the government.[14]

At the threshold we note elements of coercion in connection with both consents.[15] After he had ascertained the legal immigration status of Chavez-Villarreal and his passenger, Agent Vonn retained possession of their alien registration cards. He still held the cards when he asked for permission to search. The card was vital to Chavez-Villarreal's legal presence in this country; without it, his disposition, if indeed not ability, to decline Vonn's request expectedly was significantly impaired.[16]

We pretermit, however, our inquiry into voluntariness because we are convinced that the foregoing circumstances and others require a finding that the taint of the illegal detention had not been dissipated at the time agent Vonn obtained the defendant's

---

[14]**Brown**; **United States v. Richard**, 994 F.2d 244 (5th Cir. 1993); **United States v. Pierre**, 932 F.2d 377 (5th Cir. 1991), reversed on other grounds, 958 F.2d 1304 (5th Cir.) (en banc), cert. denied, ___ U.S.___, 113 S.Ct. 280, 121 L.Ed. 2d 207 (1992).

[15]Six factors bear on the voluntariness of consent: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. **Richard**.

[16]See **Florida v. Royer**, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed. 2d 229 (1983) (retention of the defendant's airplane ticket and driver's license is a show of official authority indicative of a seizure rather than a consensual encounter); **United States v. Berry**, 670 F.2d 583 (5th Cir. 1982) (en banc) (same); **United States v. Jordan**, 958 F.2d 1085, 1087 (D.C.Cir. 1992) ("Without his ticket and license, the defendant was not able to 'decline the officer's request' for an interview"); **United States v. Gaviria**, 775 F. Supp. 495 (D.R.I. 1991) (officer's retention of the defendant's green card is evidence that his consent to search was not voluntary).

8

consent.  Less than 15 minutes elapsed between the stop and the second search.  There were no intervening occurrences that might have attenuated the taint before the verbal consent to the first search.  To the contrary, Vonn's retention of the green cards reinforced his authority.  Vonn told Chavez-Villarreal that he could refuse to consent to the second search but by then refusal seemed pointless; Vonn had made known his suspicions about narcotics.  Although we recently held such an advisory sufficiently attenuating in **United States v. Kelley**,[17] that case did not involve circumstances such that the consenting party would have thought that discovery of the incriminating evidence was inevitable. Finally, we are persuaded that the required indicia of individualized suspicion were so utterly lacking herein that only suppression will serve the deterrence function of the exclusionary rule.[18]

The motion to suppress should have been granted.  The evidence found in the searches of the Suburban, including the marihuana and the firearm, is inadmissible.  So too are the incriminating statements that Chavez-Villarreal made during processing.  The government has advanced no persuasive argument for attenuation with respect to these statements and we find none in the record.

_____

[17]981 F.2d 1464 (5th Cir.), cert. denied, ___ U.S. ____, 113 S.Ct. 2427, 124 L.Ed. 2d 647 (1993).  In **Pierre**, we discussed the divergent lines of authority on this issue in this circuit.

[18]Cf. **United States v. Sheppard**, 901 F.2d 1230 (5th Cir. 1990) (where alleged misconduct was at worst a minor and technical fourth amendment violation, suppression would not promote the deterrence function of the exclusionary rule).

The convictions are VACATED and the matter is REMANDED for further proceedings consistent herewith.