**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ernesto GUERRERO–BARAJAS, Defendant–Appellant.**

**No. 99–41208.**

United States Court of Appeals, Fifth Circuit.

Jan. 19, 2001.

As Revised Jan. 26, 2001.

David Hill Peck (argued), James Lee Turner, Asst. U.S. Atty., Don Calvert, Houston, TX, for Plaintiff–Appellee.

Roland E. Dahlin, II, Fed. Pub. Def., Jeffrey L. Wilde, Asst. Fed. Pub. Def., Laura Fletcher Leavitt (argued), Houston, TX, for Defendant–Appellant.

Before REYNALDO G. GARZA, STEWART and DENNIS, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Ernesto Guerrero–Barajas ("Barajas"), a United States citizen, appeals the federal district court's denial of his motion to suppress. For the reasons stated below, we affirm the federal district court's denial of Barajas's motion.

## 1. Factual and Procedural Background

In the early morning of April 21, 1999, Barajas and nine illegal aliens were traveling north on Farm to Market Road ("FM") 88 in a large burgundy colored sedan ("Sedan"). Upon reaching State Road ("SR") 186, Barajas turned left and began traveling west.

At the same time, United States Border Patrol agents Hector Salazar and Jesus Ramos (collectively "Agents") were on a roving patrol traveling east on SR 186 west of FM 88. The Agents were in a marked vehicle, with their headlights on, observing traffic. At the time, agent Hector Salazar ("Salazar") was a thirteen-year veteran with the United States Border Patrol, and agent Jesus Ramos had been with the United States Border Patrol for twenty-eight months. The Agents were aware that this was a common route and area for alien smuggling and approximately thirty-five miles north of our border with Mexico. Moreover, Salazar had apprehended illegal aliens in the area and conducted investiga-

tory stops of low riding vehicles from which he had apprehended illegal aliens.

At approximately 12:30 a.m., after not seeing any vehicles for a few minutes, the Agents noticed a set of headlights coming toward them in the eastern horizon. The Agents pulled their vehicle over onto the south side of SR 186 and positioned it so that their vehicle faced a northeasterly direction. They were on an unimproved shoulder about ten feet from SR 186's eastbound lane. With their headlights on, the Agents waited until the vehicle passed. As the vehicle passed, the Agents observed the Sedan, traveling at a normal speed, riding low in the back with heavily tinted windows that prohibited them from viewing the inside.

The Agents decided to follow the Sedan. They turned their vehicle around and headed west on SR 186. The Sedan drastically slowed and began to weave from side to side within its lane. The Agents attempted to ascertain the number of occupants in the Sedan, but were unsuccessful because of the heavily tinted windows. The Agents decided to make an investigatory stop; they turned their emergency patrol lights on. The Sedan immediately pulled off the road. As it came to a sudden stop, the Sedan's doors flew open. Barajas, the driver, and nine illegal aliens jumped out and attempted to flee. The Agents stopped their vehicle on the Sedan's passenger side; they apprehended Barajas and the nine illegal aliens.

The Agents took Barajas and the nine illegal aliens into custody. They read them their *Miranda*[1] rights. Barajas signed an I–214 form acknowledging that the Agents had read him his rights and that he waived those rights. Barajas then admitted that he was transporting illegal aliens and that he knew his conduct was illegal.

In the indictment, the Grand Jury charged Barajas with two counts of violating 8 U.S.C. § 1324(a)(1)(A)(ii) and (A)(v)(II). Barajas filed a motion to suppress all of the evidence from the investigatory stop and all statements made thereafter on the basis that the Agents' suspicion that the Sedan's occupants were involved in illegal activity was not reasonable, and thus, violated his Fourth Amendment right to be free from unreasonable searches and seizures. On June 22, 1999, the federal district court heard the motion. The trial court denied the motion based on the totality of the circumstances known to the Agents when they made the investigatory stop and the Agents' experience in evaluating such circumstances. Pursuant to Federal Rule of Criminal Procedure 11(a)(2), Barajas voluntarily entered a conditional plea of guilty subject to his right to appeal the denial of his motion to suppress. On October 5, 1999, the trial court accepted Barajas's guilty plea and entered its judgment. Later that same day Barajas filed his notice of appeal.

### 2. Discussion

The appellant, Barajas, argues that the investigatory stop violated his Fourth Amendment right to be free from unreasonable searches and seizures because the Agents' suspicion that the Sedan's occupants were involved in illegal activity was not reasonable. We disagree. We hold that the Agents did not violate Barajas's Fourth Amendment rights when they conducted the investigatory stop because the Agents' suspicion that the occupants were involved in illegal activity was reasonable based on the totality of the circumstances known to the Agents when they stopped the Sedan and their experience in evaluating such circumstances. Accordingly, the federal district court did not err when it denied Barajas's motion to suppress.

### 2.1 Standard of Review

■ We review a federal district court's findings of fact on a motion to suppress for clear error. *See United States v. Ceniceros*, 204 F.3d 581, 584 (5th

---

**1.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Cir.2000). We view the evidence in the light most favorable to the prevailing party in the trial court. *See United States v. Zapata–Ibarra*, 212 F.3d 877, 880 (5th Cir. 2000). A federal district court's findings of fact are not clearly erroneous unless we have a definite and firm conviction that a mistake has been committed. *See id.* A federal district court's conclusion that reasonable suspicion of illegal activity existed is a legal conclusion subject to *de novo* review.[2] *See id.* at 880–81.

### 2.2 The Federal District Court did not err when it denied Barajas's motion to suppress

 Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of her constitutional rights. *See United States v. Roch*, 5 F.3d 894, 897 (5th Cir.1993); *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977), *cert denied* 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977). There are situations, however, where the burden shifts to the government. *See id.* When the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional.[3] *See id.* Therefore, in the instant case, since the Agents conducted an investigatory stop without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the investigatory stop was constitutional.

 "The Fourth Amendment provides that '[t]he right of the people to be

---

**2.** Barajas raises the issue that the federal district court's findings of fact are clearly erroneous, however he fails to argue that the underlying facts are disputed. Thus, our review is limited to a *de novo* review of whether reasonable suspicion of illegal activity existed.

**3.** We recognize, as did this Court in *United States·v. Rocha*, that *United States v. Casteneda*, 951 F.2d 44, 48 (5th Cir.1992) contains language regarding the burden of proof in a

free in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....'" *Bond v. United States*, 529 U.S. 334, 120 S.Ct. 1462, 1464, 146 L.Ed.2d 365 (2000) (quoting U.S. Const. amend. IV). A United States Border Patrol agent's temporary detention of an occupant of a vehicle for investigatory purposes while on roving patrol is constitutional if, at a minimum, the agent reasonably suspects that an occupant of the vehicle is involved in illegal activity. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Zapata–Ibarra*, 212 F.3d at 881; *United States v. Chavez–Chavez*, 205 F.3d 145, 147 (5th Cir.2000); *Ceniceros*, 204 F.3d at 584. An unparticularized suspicion or hunch will not suffice, but proof that an occupant of the vehicle is involved in illegal activity by a preponderance of the evidence is not required. *See United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Ceniceros*, 204 F.3d at 584; *United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999). Rather, the agent's suspicion is reasonable if it is based on specific and articulable facts and the rational inferences that can be drawn therefrom. *See Brignoni–Ponce*, 422 U.S. at 884, 95 S.Ct. 2574; *Zapata–Ibarra*, 212 F.3d at 881; *Chavez–Chavez*, 205 F.3d at 147; *Ceniceros*, 204 F.3d at 584.

 A court may take into account any number of facts when determining whether an agent's suspicion was reasonable. *See id.* These facts may include, but are not limited to: (1) an agent's experience in detecting illegal activity; (2)

---

suppression hearing when the government searches or seizes a defendant without a warrant that is inconsistent with the language in *United States v. de la Fuente*. Since we are bound to follow the decision of the first panel, and *United States v. de la Fuente* came nearly fifteen years before *United States v. Castendeda*, *United States v. de la Fuente* controls. *See Ryals v. Estelle*, 661 F.2d 904, 906 (5th Cir. 1981).

proximity of the area where the investigatory stop occurred to an international border; (3) the area's known characteristics for illegal activity; (4) information about recent illegal activity in the area; (5) the area's usual traffic patterns; (6) erratic driving or obvious attempts to evade agents; (7) the type of vehicle and other characteristics of the vehicle known to the agents to be frequently used in illegal activity including whether the vehicle is riding low or its suspension is modified; (8) the number, appearance, and behavior of the occupants of the vehicle. *See id.* No single fact is determinative. *See id.* A court must examine each case based on the totality of the circumstances known to the agent when she made the investigatory stop and her experience in evaluating such circumstances. *See id.* The Fourth Amendment does not require an agent to eliminate all reasonable possibilities of legal activity before conducting an investigatory stop, nor must every fact weigh in favor of illegal activity for an agent to reasonably suspect that an occupant of the vehicle is involved in an illegal activity. *See Zapata–Ibarra*, 212 F.3d at 884.

 The Agents were aware of and identified specific and articulable facts that led them to suspect that the occupant of the Sedan was involved in the illegal activity of transporting illegal aliens. The Agents were aware that this was a common route and area for alien smuggling and approximately thirty-five miles north of our border with Mexico. It was 12:30 a.m. Lawful vehicles infrequently and typically do not travel in that area at that time of day. Salazar had apprehended illegal aliens in the area and conducted investigatory stops of low riding vehicles from which he had apprehended illegal aliens. The Agents testified that the Sedan was riding low, and we presume they were not lying about this fact because when Barajas stopped, he and nine illegal aliens exited the Sedan. The Agents could not see the number, appearance, or behavior of the Sedan's occupants, if there were any other

than the driver because of the Sedan's heavily tinted windows. Finally, the driver slowed and began to swerve within his lane once the Agents began to follow him.

 The government carried its burden. Based on the totality of the circumstances known to the Agents when they made the investigatory stop and their experience in evaluating such circumstances, the greater weight of the evidence supports a finding that these specific and atriculable facts, and the rational inferences that can be drawn therefrom, would reasonably lead an agent to suspect that an occupant of the Sedan was involved in the illegal activity of transporting illegal aliens. Therefore, the Agents did not violate Barajas's Fourth Amendment right to be free from unreasonable searches and seizures when they conducted the investigatory stop because their suspicion that the occupants of the Sedan were involved in illegal activity was reasonable. Accordingly, the federal district court did not err when it denied Barajas's motion to suppress. We specifically hold, however, that tinted or heavily tinted windows alone do not rise to the level of reasonable suspicion.

### 3. Conclusion

Based on the foregoing, we AFFIRM the federal district court's denial of Barajas's motion to suppress.

DENNIS, Circuit Judge, dissenting:

I respectfully dissent because, in my opinion, the collage of innocent and insubstantial facts to which the prosecution witnesses testified did not provide a reasonable basis for suspicion of criminal activity to justify stopping Guerrero–Barajas. The sensate things relied upon by the border patrol agents in forming their suspicions of law violation were that at 12:30 a.m., a low-riding vehicle with tinted windows traveled west on a Texas road located approximately thirty-five miles north of the Mexican border. When the border-patrol car approached from behind, the defendant's ve-

hicle began to slow and weave within its lane. The majority correctly notes not only that the government bears the burden of proof in proving that this stop was constitutional, *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir.1977), but also that we review de novo whether there was an objective basis for a reasonable suspicion to stop the Defendant's vehicle. *United States v. Zapata–Ibarra*, 212 F.3d 877, 880–81 (5th Cir.2000).

"If there is no reason to believe that the vehicle has traveled from the border, the remaining factors must be examined carefully." *United States v. Aldaco*, 168 F.3d 148, 150 (5th Cir.1999) (citing *United States v. Rodriguez–Rivas*, 151 F.3d 377, 380 (5th Cir.1998)). The record contains insufficient evidence upon which the border patrol agents could have based a reasonable suspicion that the vehicle had come from the border. The agents had not received any information that the defendant's sedan had come from the border or was involved in illegal-immigrant smuggling. Indeed, the defendant was driving west on State Road 186, which runs parallel to the border, when the Agents stopped the vehicle. Although the government contends that the defendants turned onto State Road 186 from the north-bound State Road 88, the maps introduced into evidence show numerous roads intersecting State Road 88 between State Road 186 and the border, indicating a greater likelihood that the vehicle did not originate at or near the border.

Even if the evidence had tended to show that the defendant was coming from the border, "that factor 'alone [is] not dispositive in the reasonable suspicion analysis.'" *United States v. Lopez–Valdez*, 178 F.3d 282, 287 (5th Cir.1999) (quoting *United States v. Pacheco*, 617 F.2d 84, 86 (5th Cir.1980) (alteration by *Lopez–Valdez* court)). Although the sedan was less than

fifty miles from the border, "[a] vehicle may not be stopped simply because it is traveling on a road near the U.S.-Mexican border." *Lopez–Valdez*, 178 F.3d at 286 (citing *Brown v. Texas*, 443 U.S. 47, 49–52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (stating that presence in a high-crime area does not provide reasonable suspicion)); *United States v. Newell*, 506 F.2d 401, 405 (5th Cir.1975) (stating that presence in a border area does not place a citizen "within a deconstitutionalized zone"). This court must examine the "whole picture," *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), and consider all the factors specified in *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

The majority characterizes the road as "a common route for alien smuggling" and the time of day as one when travel by lawful vehicles is "infrequen[t]." The majority does not cite any concrete evidence in the record as a basis for these conclusions. "We previously have held that merely being on a road frequently used for illegal activity is insufficient to justify an investigative stop." *United States v. Diaz*, 977 F.2d 163, 165 (5th Cir.1992) (citing *United States v. Casteneda*, 951 F.2d 44, 47 n. 4 (5th Cir.1992)). The time of day may be a legitimate, yet marginal consideration, in the reasonable suspicion analysis "if other objective facts support a conclusion that persons passing a particular point at a particular time may be involved in illegal activity," *Cortez*, 449 U.S. at 420–21, 101 S.Ct. 690, such as travel through a check point at a time when the agents were known to be changing shifts. *United States v. Jones*, 149 F.3d 364, 370 (5th Cir.1998) (stating that coming through the border at the time border patrol agents change shifts "does weigh in favor of reasonable suspicion.").[1] In the present case,

---

1. *But see United States v. Moreno–Chaparro*, 180 F.3d 629, 633 (5th Cir.1998) ("While we may empathize with the Border Patrol's concerns regarding increased exposure during

times of reduced manpower, we are not willing to sacrifice the constitutional protections of drivers to lessen the perceived adverse impact resulting from the decision of the Border

however, the conclusion is not based on other objective facts. Instead, the majority adopts, as a self-proving fact, the prosecution witnesses' unsupported conclusions that lawful travel at that time and place was infrequent. Maj. Op. at 432–33. Moreover, "[the] decision to travel such roads at less busy hours should not be the difference-constitutionally speaking-determinative of the right of the officers to stop vehicles." *Frisbie,* 550 F.2d at 338 (citing *Brignoni–Ponce,* 422 U.S. at 882, 95 S.Ct. 2574).

Furthermore, in light of our hopelessly inconsistent treatment of the factor of a vehicle's low carriage, it is questionable how much weight, if any, it should be given. *See, e.g., United States v. Melendez–Gonzalez,* 727 F.2d 407, 412 (5th Cir. 1984) ("In any event, even if relevant, the fact that defendant's car was supposedly 'riding low' has not been given determinate weight in border patrol cases.") (internal citation omitted); *United States v. Orona–Sanchez,* 648 F.2d 1039, 1042 (5th Cir. Unit A June 1981) ("[N]o weight is to be given to the fact that it was apparently heavily loaded...."); *Pacheco,* 617 F.2d at 86 ("[T]his factor has little weight.") (citing *United States v. Lamas,* 608 F.2d 547, 548 (5th Cir.1979)); *But see United States v. Lopez–Gonzalez,* 916 F.2d 1011, 1015 (5th Cir.1990) ("We believe the district court was entitled to consider ... that the vehicle was heavy in the rear.") (internal quotation omitted); *United States v. Garcia,* 732 F.2d 1221, 1225 n. 2 (5th Cir.1984) (distinguishing *Orona–Sanchez* and *Pacheco* by stating that "the testimony reflects a degree of loading that is more than merely 'heavy' but is indeed obvious overloading...."); *United States v. Sarduy,* 590 F.2d 1355, 1358 n. 4 (5th Cir.1979) ("We have consistently regarded the fact that a vehicle is heavily loaded as a factor justifying a stop.").[2] Assuming that some weight should be given to the fact that the vehicle was riding low, this consideration should not be emphasized, as "a 'heavy load' is just as consistent with innocent conduct" as illegal activity. *Garcia,* 732 F.2d at 1230 (Tate, J., dissenting).

Today, tinted automobile windows are so common that they can hardly be considered an indicium of criminal activity. *Diaz,* 977 F.2d at 165 n. 5 ("Similarly de-emphasized ..., with good reason, were the tinted windows on Diaz's car; tinted windows are common."); *United States v. Villalobos,* 161 F.3d 285, 289–90 (5th Cir. 1998) ("[T]inted windows are not uncommon in southwest Texas...."). Extremely dark windows may not "allay ... other suspicio[ns]," *Villalobos,* 161 F.3d at 290, but in the present case, there is no evidence that the tinted windows were "extremely" dark. The officers merely testified that they could not see through the tinted windows at night.

Finally, under the circumstances, the slowing and wavering of the defendant's vehicle was not suspicious. There was no evidence of evasive or unusually erratic behavior by the driver of the vehicle. Prior to being followed by the patrol car, the defendant's vehicle had been operated in a legal, normal, and safe manner. As the majority notes, the sedan was "traveling at a normal speed" when it passed the agents' car on the side of the road. Maj. Op. at 431. Only when it became evident that the agents were tailing the sedan did it slow and begin to waver within its lane. Numerous panels of this court have held this situation to be insufficient to raise a reasonable suspicion of criminal activity. *Zapata–Ibarra,* 212 F.3d at 882 ("There-

---

Patrol to change shifts at the same time everyday.").

**2.** Moreover, the border patrol has even, at times, attempted to argue that cars "riding high" are suspicious because "people who smuggle aliens tend to elevate their trunks in order to disguise the presence of a heavy load." *United States v. Lopez,* 564 F.2d 710, 712–13 (5th Cir.1977) (rejecting the border patrol's argument and characterizing its position as "Riding high or riding low, either way a-searching we will go").

fore, Zapata–Ibarra's deceleration and swerving on a such a road at nighttime, in response to a rapidly accelerating vehicle with its high-beam lights on, weighs, at best, only slightly in favor of the reasonableness of Zertuche's suspicions.") (internal citation omitted); *United States v. Samaguey,* 180 F.3d 195, 199 (5th Cir. 1999) (stating that swerving in response to an approaching vehicle is "hardly suspicious"); *Jones,* 149 F.3d at 370 ("[W]hen the officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed."); *United States v. Chavez–Villarreal,* 3 F.3d 124, 127 (5th Cir.1993) ("We find nothing suspicious about a driver changing lanes and slowing down when he realizes a vehicle is approaching from the rear."); *Diaz,* 977 F.2d at 165 (holding that a driver's deceleration to forty miles per hour after agents began pursuit did not create reasonable suspicion, despite the agents' contention that they feared a "bailout"). Indeed, slowing in response to an approaching vehicle "is a normal reaction if the driver wishes to let the tailing vehicle pass." *Chavez–Villarreal,* 3 F.3d at 127; *see also Diaz,* 977 F.2d at 165 ("Finally, there is nothing suspicious about a speeding car slowing down after a marked patrol unit turns to follow, with or without flashing lights. Rather than unusual, that is an expected reaction."). Weaving slightly within one's lane is often the result of a driver checking his mirror in response to a tailing or tailgating vehicle. The prosecution witnesses testified at the suppression hearing that the driver began to swerve, as if "looking back or something." Appellant's Brief at 12.

Considering the totality of the circumstances, this case appears to be based on nothing more than a mere "hunch" by an experienced agent who has "play[ed] our parlor game and 'articulate[d]' to us virtually any set of facts as triggering suspicion

in his mind." *Zapata–Ibarra,* 223 F.3d 281, 285 (5th Cir.2000) (Wiener, J., dissenting). With respect to the *Brignoni–Ponce* factors addressed by the district court, the findings of the district court are insufficient to lead to reasonable inferences of wrongdoing. With regard to the remainder of the *Brignoni–Ponce* factors, no evidence exists as to the "number, appearance, or behavior of the occupants of the vehicle." No evidence exists that passengers attempted to hide, *Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. 2574, or that they were "unwashed" or "unkempt," *Garcia,* 732 F.2d at 1223. The fact that nine previously unseen immigrants exited the car *after* the stop cannot be used to form a basis for a reasonable suspicion of their unlawful presence *before* the stop occurred. Finally, no evidence was introduced as to any "recent illegal activity" in the area.

In *Zapata–Ibarra,* 223 F.3d at 282 (Wiener, J., dissenting) (citations omitted), our colleague Judge Wiener declared that "history is likely to judge the judiciary's evisceration of the Fourth Amendment in the vicinity of the Mexican border as yet another jurisprudential nadir, joining *Korematsu [v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944)], *Dred Scott [v. Sandford,* 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856)], and even *Plessy [v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)] on the list of our most shameful failures to discharge our duty of defending constitutional civil liberties against the popular hue and cry that would have us abridge them." His dictum has the ring of truth and may prove to be more prophetic than hyperbolic, considering that we currently have no way of knowing how many *innocent* persons are being subjected to such suspicionless stops. Although, according to the Gospel, "A prophet is not without honor, save in his own country,"[3] I hope in this instance the majority of this panel and this court will heed our colleague's warning and re-

---

**3.** *Matthew* 13:57.

pent for the sake of its own dignity and that of all persons within its jurisdiction.