# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 2, 2024

Lyle W. Cayce
Clerk

———————

No. 23-30491

———————

United States of America,

*Plaintiff—Appellee,*

*versus*

Trevor Selwyn Daniel, Jr.,

*Defendant—Appellant.*

———————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:20-CR-79-1

———————————————————————

Before Higginson, Willett, and Oldham, *Circuit Judges.*

Per Curiam:[*]

Trevor Selwyn Daniel, Jr., was charged with possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A). Daniel filed a motion to suppress, which the district court denied. He then entered a conditional guilty plea, reserving the right to appeal the denial of his suppression motion. He now exercises that right, and we AFFIRM.

———————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-30491

## I

On February 12, 2020, Louisiana State Police Sergeant Brett McKee was watching eastbound traffic while stationed on the shoulder of I-10. As a member of the interdiction patrol, he was looking for traffic violations and other, more serious criminal activity, including drug trafficking. McKee had served on the patrol for two years and with the Louisiana State Police for twelve.

At some point that night, McKee observed a Toyota SUV driving about two to three miles above the speed limit. The driver abruptly braked as he passed, even though there was no traffic. McKee considered this to be "stress-induced behavior"—that is, behavior that's atypical of a law-abiding driver—and began following the car. The car drifted over the white fog line in violation of Louisiana law, so McKee pulled it over.[1]

McKee told the driver, Daniel, that he was being stopped for improper lane usage and asked him to exit the vehicle.[2] Daniel complied but explained that the car, which he said was a rental, braked suddenly because of its adaptive cruise control. McKee and Daniel walked to the driver's side so that Daniel could get his ID and then around to the passenger's side so that Daniel could get the rental agreement.

While walking around the car, McKee saw "four to five bags in the back, large bags" and "a lot of trash," including "a bunch of drinks" and "fast food." He commented that it looked like Daniel had been "on the road." Daniel said he had a security business and, seemingly losing track of

---

[1] LA. STAT. ANN. 32:79(1) (2024); *State v. Waters*, 780 So. 2d 1053, 1056–57 (La. 2001) (holding that "touch[ing] the right-hand fog lane on the shoulder" violates LA. STAT. ANN. 32:79(1)).

[2] McKee's body camera recorded their interaction.

what he was doing, handed McKee a random paper and his entire wallet, rather than just his ID.

McKee then asked Daniel about his business-related travel. Daniel responded vaguely, saying that he had a client "down there." When McKee twice followed up, Daniel clarified that he was traveling from "Texas" and then, after some stuttering, "Sugarland." McKee asked Daniel when he went to Sugarland. Daniel hesitated, asked McKee what day it was (Wednesday), and then said that he went to Sugarland on Monday.

McKee and Daniel continued to talk while McKee looked over Daniel's ID and rental agreement. In response to McKee's questions, Daniel said that he did not have a gun in the car and that he was still in the "talking stage" with a potential client in Sugarland. He told McKee that he started his security business when he got out of the military and, when McKee asked him which branch he served in and for how long, he answered quickly and confidently.

About four and a half minutes into the stop, McKee told Daniel that he was going to his car to run computer checks. McKee used a program called ELSAG, a license plate reader that tracks when a vehicle passes by certain cameras, to see where Daniel's car had traveled. The ELSAG database showed that Daniel's car had passed cameras far south of Sugarland, near the Mexico border. McKee's criminal-history check revealed that Daniel was a convicted felon.

McKee returned to Daniel and asked whether he had traveled anywhere besides Sugarland, whether anyone else had driven the car, and whether the car contained any illegal substances. Daniel responded "no" to all. Daniel then denied McKee's request to search the vehicle.

At that point, about ten minutes into the stop, McKee contacted one of the U.S. Border Patrol's dog handlers to request a dog sniff. The dog

handler and dog arrived about four minutes later. The dog conducted a "free air sniff" around the vehicle and alerted to the driver's side door. The officers subsequently searched the vehicle and found a firearm and 25 kilograms of cocaine.

Daniel was charged by indictment with possessing with the intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A). He later moved to suppress the evidence seized during the traffic stop, arguing that (1) McKee lacked reasonable suspicion to extend the stop by conducting the ELSAG and criminal-history checks and arranging a dog sniff and (2) the dog's alert did not give probable cause to search his car. The government opposed the motion. A magistrate judge held an evidentiary hearing, ordered post-hearing briefs, and ultimately recommended that Daniel's motion be denied. The district court accepted the recommendations and denied the motion.

Daniel pleaded guilty but preserved the right to appeal the district court's denial of his motion to suppress. The district court sentenced Daniel to 120 months in prison and five years of supervised release.

Daniel timely appealed.

## II

On appeal from the denial of a motion to suppress, we review factual findings for clear error and conclusions of law *de novo*. *United States v. Massi*, 761 F.3d 512, 519 (5th Cir. 2014). We view the evidence "in the light most favorable to the party who prevailed in the district court," which here is the Government. *See id.* at 520 (citation omitted). "When determining whether the facts provided reasonable suspicion, we must give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *United States v. Henry*, 853 F.3d 754, 756 (5th Cir. 2017) (internal quotation marks and citation omitted). And where, as here,

"a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *See United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005). We uphold the district court's ruling "if there is any reasonable view of the evidence to support it." *Massi*, 761 F.3d at 520 (citation omitted).

Generally, the movant—here, Daniel—"has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [his] constitutional rights." *See United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). But because McKee conducted the search without a warrant, the burden shifts to the Government to prove, by a preponderance of the evidence, that its actions were constitutional. *See id.*

## III

We begin by considering whether McKee violated Daniel's Fourth Amendment rights by running an ELSAG search, checking Daniel's criminal history, and requesting a dog sniff.

The Fourth Amendment's protection against "unreasonable searches and seizures," *see* U.S. CONST. amend. IV, "extends to vehicle stops and temporary detainment of a vehicle's occupants," *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). We analyze the constitutionality of a traffic stop under the two-step test from *Terry v. Ohio*, 392 U.S. 1 (1968). *See id.* First, "we determine whether the stop was justified at its inception." *Id.* If it was, "we determine whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *Id.* (internal quotation marks and citation omitted).

"If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused

the stop, he may further detain [the car's] occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *opinion modified on other grounds on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010). "[S]uspicion is reasonable if it is based on specific and articulable facts and the rational inferences that can be drawn therefrom." *Guerrero-Barajas*, 240 F.3d at 432. "Although a mere 'hunch' does not create reasonable suspicion[] . . . the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal quotation marks and citations omitted).

To determine whether the officer had a reasonable suspicion, we "must examine . . . the totality of the circumstances known to the [officer] when [he] made the investigatory stop and [his] experience in evaluating such circumstances." *Guerrero-Barajas*, 240 F.3d at 433. "We give due weight to the officer's factual inferences because officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Smith*, 952 F.3d 642, 648 (5th Cir. 2020) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Daniel concedes that *Terry*'s first prong is satisfied because the initial traffic stop for improper lane usage was justified. But he argues that, under *Terry*'s second prong, McKee lacked reasonable suspicion to extend the stop by searching the ELSAG database, checking his criminal history, and arranging a dog sniff. The Government responds that the ELSAG and criminal-history checks fell within the traffic stop's original mission, but, even if not, McKee had by then developed reasonable suspicion and could extend the stop to conduct those checks. The Government also argues that McKee had reasonable suspicion to request a dog sniff.

Neither party cites, nor have we have found, any published cases from our court that address whether a criminal-history check and ELSAG search fit within a traffic stop's original mission.[3] In two unpublished cases, we have assumed they do, but without confronting the question directly. *See United States v. Solis*, No. 22-40029 & No. 22-40088, 2023 WL 107529, at *1 (5th Cir. Jan. 4, 2023) (per curiam), *cert. denied*, 143 S. Ct. 2478 (2023); *United States v. Rodriguez-Flores*, 249 F. App'x 317, 318, 320 (5th Cir. 2007) (per curiam). *But cf. United States v. Frazier*, 30 F.4th 1165, 1179–80 (10th Cir. 2022) ("[T]he [license plate reader] search plainly exceeded the scope of the stop's traffic-based mission."). We need not weigh in today because we conclude that McKee already had a reasonable suspicion that Daniel was engaging in other criminal activity by the time he ran the checks and requested the dog sniff.

McKee testified to, and his body-camera footage confirms, "specific and articulable facts" that gave rise to a reasonable suspicion that Daniel was engaged in other criminal activity. *See Guerrero-Barajas*, 240 F.3d at 432.

First, McKee observed that Daniel was traveling on I-10, which he knew from years of experience is a major drug-trafficking corridor. "[T]ravel along known drug corridors [is] a relevant—even if not dispositive—piece of the reasonable suspicion puzzle." *Smith*, 952 F.3d at 649.

Second, McKee testified that Daniel appeared nervous while driving. McKee saw Daniel brake "abruptly" when passing his car, even though "[t]here was no traffic around" and he "wasn't speeding," and then drift over the fog line—two driving behaviors that, according to McKee, could

---

[3] Like other circuits, we have said that an officer may "request to examine a driver's license and vehicle registration or rental papers during a traffic stop and to run a computer check on both." *United States v. Brigham*, 382 F.3d 500, 507–08 (5th Cir. 2004). But those types of checks are not an issue here.

suggest that Daniel was nervous about being near an officer because of criminal activity. *See United States v. Gonzales*, 311 F. App'x 725, 726 (5th Cir. 2009) (per curiam) (concluding that the officer had a reasonable suspicion of criminal activity in part because, "when Gonzales passed his marked patrol vehicle, Gonzales tapped his breaks even though he was not speeding").

McKee testified that Daniel continued to act nervous and evasive after McKee pulled him over. While walking around Daniel's car, McKee noticed the trash and commented that Daniel must have been on the road for a while. McKee testified that Daniel "chuckle[d]," "got really anxious" and lost "function of what he was doing." When McKee asked for Daniel's rental agreement, Daniel instead tried to give McKee his whole wallet and then gave McKee the wrong document. In addition, when McKee asked where Daniel was traveling from,[4] Daniel at first answered "down there," and only after McKee twice followed up did he say "Texas" and then, finally, "Sugarland." McKee testified that, from his experience, Daniel's "vague" and "delay[ed]" responses suggested that he "either didn't know where he was coming from or he was trying to hide where he was coming from." And, by contrast, Daniel responded without hesitation to McKee's questions about his military service. "[N]ervous, evasive behavior," such as Daniel's here, "is a pertinent factor in determining reasonable suspicion." *See Illinois*

---

[4] After Daniel volunteered that he was traveling for his "security business," McKee asked Daniel about his trip. These questions "were related in scope to [McKee's] investigation of the circumstances that caused the stop" and thus permissible under *Terry*'s second prong. *See United States v. Macias*, 658 F.3d 509, 519 (5th Cir. 2011); *see also id.* at 517 ("Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made." (citation omitted)).

*v. Wardlow*, 528 U.S. 119, 124 (2000); *see also United States v. McKinney*, 980 F.3d 485, 495 (5th Cir. 2020).

Third, Daniel told McKee that he arrived in Sugarland only two days prior—a timeline that McKee testified was contradicted by the trash and four to five large duffel bags that he saw in Daniel's rental car. *Cf. United States v. Williams*, 784 F. App'x 876, 882 (5th Cir. 2019) (noting that "inconsistent or implausible answers to questions can support reasonable suspicion"). The trash signaled to McKee that Daniel was instead "traveling a . . . long distance without stopping or . . . going somewhere, turn[ing] around and coming right back," such as to pick up and then deliver a product. Likewise, the four to five duffel bags struck McKee as "a lot of luggage for one person just for a short [two-day] trip."

Daniel argues that McKee's observations had innocent explanations. He contends that countless law-abiding drivers use I-10 and that those same drivers might also be nervous when they pass an officer. And luggage and a messy car, he says, are merely innocuous evidence of travel.

However, to form a reasonable suspicion, McKee did not need to "eliminate all reasonable possibilities of legal activity." *See Guerrero-Barajas*, 240 F.3d at 433; *see also Williams*, 784 F. App'x at 882. "Reasonable suspicion is a low threshold" that requires only "some minimal level of objective justification." *United States v. Castillo*, 804 F.3d 361, 367 (5th Cir. 2015) (citation omitted). To the extent Daniel asks us to determine whether each of McKee's observations alone cross that threshold, we cannot oblige. We "may not consider the relevant factors in isolation from each other" and must instead evaluate the totality of the circumstances known to McKee. *See United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

Those circumstances, taken as a whole, gave McKee a reasonable suspicion "that criminal activity may be afoot." *See Arvizu*, 534 U.S. at 273

(internal quotation marks and citation omitted). Accordingly, to confirm or dispel that suspicion, McKee could constitutionally extend the stop to conduct ELSAG and criminal-history checks and to request a dog sniff. *See Pack*, 612 F.3d at 350, 362.

## IV

We now turn to whether the dog alert gave McKee probable cause to search Daniel's car.

When a dog's alert is the purported basis for probable cause, "[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013); *see also United States v. Shen*, 749 F. App'x 256, 261 (5th Cir. 2018) (per curiam) (same); *United States v. Ned*, 637 F.3d 562, 567 (5th Cir. 2011) (per curiam) ("[A]n alert by a drug-detecting dog provides probable cause to search."). We may "presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search" if a "bona fide organization has certified [that] dog after testing his reliability in a controlled setting." *Harris*, 568 U.S. at 246–48. Daniel bears the burden of presenting any evidence of unreliability rebutting this presumption. *See id.*; *see also id.* at 250 ("[The defendant] failed to undermine that showing [of reliability].").

Here, the dog's handler testified that the dog was certified annually by a U.S. Border Patrol K-9 instructor to detect cocaine and other drugs. The government has thus made a prima facie showing that the dog is reliable, and we may presume that its alert established probable cause. *See id.* at 246–48.

Daniel, however, argues that the dog sniff was unreliable because the dog (1) alerted by the driver's side door, not the back hatch where the drugs were later found; (2) had twice alerted in the field when no drugs were

present; and (3) had performed only twelve field searches over the past three years.

All of Daniel's arguments fail. That the dog alerted to the driver's side door does not indicate that the dog was unreliable—rather, as the dog's handler testified, the dog was trained to alert to the smell of drugs, and the driver's side had an open window from which the dog could have picked up the scent. Same for the dog's two false positives during prior field searches. Field data "may markedly overstate a dog's real false positives" because, for example, "the dog may have smelled the residual odor of drugs previously in the vehicle." *Id.* at 245–46. "The better measure of a dog's reliability thus comes away from the field, in controlled testing environments." *Id.* at 246. Accordingly, the dog's two false positives, over the course of at least twelve searches, "have relatively limited import." *See id.* at 245. Regardless, the dog's 83.3% field success rate assures us that its alert reflected at least a "fair probability" that contraband would be found, which is all that's required for probable cause. *See id.* at 244. Finally, we are unconcerned by the number of field searches that the dog had previously performed. The dog was certified annually, the dog and its handler had worked together for three consecutive years, and there were no signs that McKee or the handler "cued the dog" or were "working under unfamiliar conditions." *See id.* at 247. Thus, this "sniff is up to snuff." *See id.* at 248.

Because the dog's certification establishes its reliability and Daniel fails to undermine that showing, we agree with the district court that the dog's alert gave McKee probable cause to search Daniel's car.

We AFFIRM.